In the Matter of SOUTHERN
BIOTECH, INC., Debtor.

Bankruptcy No. 82–1082.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Nov. 30, 1983.

**312**

Zala Forizs, St. Petersburg, Fla., for trustee.

Thomas B. Mimms, McFarlane, Ferguson, Allison & Kelly, Tampa, Fla., for State of Florida.

Albert I. Gordon, Tampa, Fla., for debtor.

## ORDER ON MOTION TO ASSUME EXECUTORY CONTRACT

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 11 case and the matter under consideration is a Motion filed by the Trustee who seeks to assume an executory contract. Southern Biotech, Inc. f/k/a Southern Medical and Pharmeceutical Corporation (Southern Biotech) who initially filed its Petition for Relief under Chapter 11 operated its business initially as a debtor-in-possession, but after the Court-appointed examiner recommended that the current management should be removed, Mr. Angelo Santolla was appointed Trustee pursuant to § 1104 of the Code with consent of the Debtor.

Ordinarily, the motion under consideration would not present any particular problem, especially if the executory contract sought to be assumed is a run-of-the-mill commercial contract such as an unexpired lease and the Trustee or the Debtor-in-Possession is usually able to assume the contract provided they are able to comply with the requirements imposed by § 365(b)(1)(A), (B), (C) of the Bankruptcy Code. Unfortunately, this is not the case in the present instance due to the unique nature of the executory contract sought to be assumed by the Trustee.

In order to put the matter into proper focus, a summarization of the facts as developed not only at the final evidentiary hearing, but as they appear from the record so far established in this case of which this Court takes judicial notice, can be stated as follows:

Southern Biotech is a Florida corporation formed in 1979. It is a publicly held corporation and prior to the commencement of this case was operating two blood component laboratories in Florida. One was opened on March 31, 1980 at the Avon Park Correctional Institution (APCI) and the other was opened in April, 1981 at the Union Correctional Institution (UCI) in Raiford, Florida. Both blood component laboratories were maintained by the State of Florida, Department of Corrections (Department). The primary function of these two blood component laboratories was to collect and process blood obtained from the inmates of these two institutions. This process is known as plasmapheresis which is a process whereby blood is extracted from the donor, its protein portion is separated from the red blood cells, is resuspended in salt water and thereafter returned to the donor. The plasma, the protein rich component, is sold to pharmaceutical companies for conversion to marketable substances. Plasma is suitable for manufacturing a variety of products used in treatment of hemophilia, some serious infections and in support of critically ill patients. With the exception of plasma known as Factor VIII used for the treatment of hemophilia, all others are treated with alcohol. It is a generally accepted proposition that alcohol kills all known viruses. In addition, there is an experimental heat inactivation process which is used for the processing of Factor VIII, a blood product used in the treatment of hemophiliacs. Although the process is still experimental, there is no hard evidence as to its effectiveness, but it appears to help to protect hemophilia sufferers from hepatitus infection. These blood collection laboratories also provided some of the white blood cells necessary for Southern Biotech's production of a native interferon and the balance having been purchased from other blood collection facilities from various facilities located outside of the State of Florida. Interferons are broad spectrum antiviral lymphokines which occur naturally, in minute amounts, in humans and animals. They

are soluble proteins produced by white blood cells which are capable of altering the biological function of other blood cells. Interferon was touted at one time as a miracle drug able to cure, or at least retard, certain types of cancer. Although Southern Biotech was originally organized to produce and to market interferon, this program ceased completely because of the high cost of production and prior to the commencement of the case and after the commencement of the case, Southern Biotech's sole source of income was derived from the sale of the plasma obtained from the inmates of the two correctional institutions maintained by the Department.

These two programs were conducted pursuant to contracts with the Department of Corrections of the State of Florida (Department) which the Trustee now seeks to assume. This contract titled "Agreement" was executed by the Department and Southern Biotech on August 15, 1980 (Trustee's Exh. # 1). The contract provides, inter alia, that Southern Biotech is permitted to operate and set up a plasma donor facility and pheresis program at the UCI's facility located in Raiford, Florida, a maximum security correctional institute. The contract requires Southern Biotech to operate the facility in full conformity with the regulations promulgated by the United States Food and Drug Administration (FDA) licensure requirements; that the plasma extraction program shall conform to all applicable and local state and federal statutes and regulations necessary to maintain licensure and must be "*conducted in accordance with good and sound medical practice.*" (emphasis supplied)

The program was designed to be voluntary. Southern Biotech was required to obtain written consents from the donors on the release form approved by the Department. The form released the Department from any and all liabilities. The consent form was to be executed only after full information was furnished to the donor inmate in accordance with the criteria necessary to assure an informed consent as specified by the FDA standards and regulations.

Southern Biotech agreed to pay each volunteer inmate donor of human plasma $5.25 per donation. Each inmate who qualified to participate in the pheresis program was entitled to an additional $1 if he voluntarily consented to receive immunizations or vaccinations, which are permitted to be performed by the FDA regulations. The program also contemplated that inmates may consent to participate in the leukopheresis program as permitted by the FDA for the production of interferon for a compensation to be negotiated and agreed upon by the parties. Southern Biotech was required under the contract to pay $2 for each volunteer inmate donation of human plasma directly to the Department for the purpose of reimbursing the Department for the utilization of the space and any attendant administrative costs incurred by the Department in connection with the program. As noted earlier, Southern Biotech also had an identical program approved by the Department which was conducted at the APCI facility. This program was discontinued earlier and the assumption of that contract is not under consideration at this time. The program at UCI was conducted until October 3, when all operations at UCI were discontinued.

It is without dispute that at that time Southern Biotech was already indebted to the Department under its contract in the total amount of $127,098.11 of which $114,-791.04 were incurred post-petition and $21,-312.68 pre-petition.

The evidence presented by the Trustee in support of its application to assume the contract relating to the UCI facility indicates that the Trustee negotiated and is about to enter into a contract with Alpha Therapeutic Corporation (Alpha) if it is approved by this Court (Trustee's Exh. # 2). Under this proposed contract, Alpha would purchase source human plasma at a certain specified price and would purchase the entire plasma production obtained by Southern Biotech from the UCI facility estimated to be 49,248 kilos (or 48,000 liters) per year. According to the Trustee's projection, this contract has a valid outstanding Establishment License for the manufacture of bio-

logical products issued by the Department of Health and Human Services of the Federal Government dated March, 1983 (Trustee's Exh. # 6); a valid outstanding Product License authorizing Southern Biotech to propogate or manufacture or prepare for sale source plasma (human), dated March 18, 1983 (Trustee's Exh. # 7); a valid outstanding Product License for Source Leukocytes issued by the Department of Health and Human Services, dated March 18, 1983 (Trustee's Exh. # 8). By virtue of § 600.-10(a) of Title 21, Code of Federal Regulations, an operation of a program under consideration requires a designation of a responsible head of the operation. In order to comply with this requirement, Southern Biotech designated Dr. Ericson to be the responsible head of the plasmapheresis program and it is without dispute that he has been accepted by the Department of Health and Human Services to function as such (Trustee's Exh. # 9). The regulations also require the designation of an onsite manager of the program. Southern Biotech designated Miss Debra J. Chisholm to be the onsite manager of the program at the UCI facility (Trustee's Exh. # 11). She also was accepted by the Department of Health and Human Services and was authorized to operate the facility.

The regulations promulgated by the Department of Health and Human Services require that any plasma program must be conducted under the supervision of the resident physician, that is, a physician must be present, actually or constructively, on the premises at the time the program is conducted. It appears that Dr. Vladmiro Holowatsch and Dr. Jorge B. Thomas have been accepted by the Department as the designated physicians to be on the premises. There is some question whether or not there is a physician available in case of an emergency within the 15 minute requirement of the contract, however, this Court is satisfied that while Dr. Holowatsch may not be able to arrive within the 15 minute specification required, there are physicians available who could be used in the case of an emergency. Thus, this Court is satisfied that Southern Biotech is in full compliance with the re-

quirement imposed by the applicable federal and state regulations.

■ According to the Trustee's projection based on the Alpha contract, the operation will break even after the second month of operation, thus the likelihood that the Trustee is able to cure the default in eight months is without serious question. The only question is whether or not this is deemed to be, under the law, a prompt curing. Considering the totality of the picture, this Court is satisfied that the time projection by the Trustee is more than reasonable and the curing of this default is deemed to be prompt if it is done under the projected time frame. It is well established that a prompt curing provision of the Code is not etched in cement and there is no hard and fast mathematical formula that determines which curing is prompt and which is not prompt. For instance, the courts have held that the curing of the default in the three year time frame is deemed to be reasonable under those particular circumstances, citing, *In re Coors of North Mississippi*, 27 B.R. 918 (Bkrtcy.N.D.Miss.1983) (3 years); cf. *In re Berkshire Chemical Haulers, Inc.*, 20 B.R. 454 (Bkrtcy.D.Mass.1982).

Based on the foregoing, it is the Trustee's contention that by virtue of § 365 he shall be authorized to assume this particular executory contract inasmuch as the evidence presented amply supports that the Trustee is able to meet the requirements of the Code for assumption of executory contracts which are as follows:

§ 365. Executory contracts and unexpired leases

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless at the time of assumption of such contract or lease, the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debt-

or to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

It is intimated by the Department, however, that since the Alpha contract has the provision in which it permits Alpha to terminate this particular contract on 120 days notice, it is conceivable that the entire contract will terminate in five months, therefore, the Trustee will not be able to cure the arrearages. A short answer to this proposition is easy and simple. If that in fact occurs, which by the way is not supported by any evidence, even if one assumes this may occur, it means only that during the five months operation if the Trustee's projection turns out to be valid, the obligation owed by Southern Biotech to the State of Florida will be substantially reduced and at least during that operation Southern Biotech will be able to maintain a viable ongoing business which in turn might furnish an alternative basis for future rehabilitation, one not necessarily based on a paid donor plasmapheresis program.

■ This leaves for consideration the third condition imposed by § 365(b)(1)(C) which is adequate assurance of future performance. This is the strongest point made by the Department who contends that the Trustee cannot live up to this contract, perform this contract pursuant to its terms which require that the plasma extraction program *will be conducted in accordance with good and sound medical practice.* (emphasis supplied) In this connection, it is urged by the Department that since the discovery of the mysterious malady called "Acquired Immunity Deficiency Syndrome" (AIDS) and its alleged impact on the safety of plasma derivatives requires a re-examination of the medical soundness of all paid donor plasmapheresis operations and requires that all paid donor programs shall be discontinued at once because of the alleged inherent danger of transmitting the dreadful disease known as AIDS.

It has been established that blood and blood products are potential transmitters of illnesses such as serum hepatitus or any other infectious agent which is present in the blood at the time the specimen is taken. There is some evidence that blood transfusions or plasma operations may transmit an agent causing malaria. It should be pointed out that this is mostly associated with blood cells rather than with plasma.

The mysterious illness of AIDS was first reported in 1981 and medical experts have learned a great deal about AIDS since. AIDS is a serious condition characterized by a specific defect in natural immunity against disease. The people who suffer from AIDS become susceptible to a variety of rare illnesses which illnesses are not normally found or are relatively mild if they occur in people whose immune systems are normal. The most common diseases found in AIDS patients are opportunistic infections such as pneumocystis carinii pneumonia, a lung infection caused by a parasite, and Kaposi's sarcoma, a rare form of cancer or tumor of the walls of the blood vessels. AIDS victims inevitably die from either of these two illnesses. There are no known diagnostic means available to detect AIDS. The incubation period of AIDS runs from eight months to as much as two years during which time the disease is asymptomatic, that is, no symptoms occur or are visible. These symptoms include fever, night sweats, swollen glands, and enlarged nymph nodes in the neck, armpits and groin, unexplained weight loss, diarrhea, persistent coughs, fatigue and loss of appetite.

It is not known whether or not the disease is caused by a virus although it is suspected to be. Contrary to some general misconceptions, routine contacts with AIDS sufferers offers no risk and it appears to be that AIDS is primarily transmitted through sexual contact. There is no hard evidence which clearly establishes the means of transmittal of this dreadful disease, although inferences based on statistics indicate that AIDS may be transmitted by blood. Statistical studies conducted by a variety of health organizations indicate that 95% of all AIDS cases occurred in people

belonging to the so-called high risk groups consisting of the following: (1) sexually active homosexuals and bisexual men with multiple sex partners which accounts for about three-fourths of all of the reported cases; (2) Haitians entrants into the United States which represents about 5% of the total cases reported; (3) present or past abusers of i.v. that is intravenous drugs which represent 17% of the total; and (4) persons with hemophilia which represent 0.8% of the total cases reported.

The donor selection process is unreliable, although approved, because selection is based on a questionnaire to be answered by paid donors who do not truthfully respond to the questionnaire for obvious reasons.

Based on this scientific evidence and the testimony of the medical experts presented, the Department urges that under the present conditions a paid donor plasmapheresis program conducted in a confined environment of a maximum security correctional institute cannot be conducted "in conformity with sound medical practice" because of the known high incidence of homosexual activity in prisons and the high number of present and past abusers of i.v. drugs coupled with the previously noted unreliable selection process. In this connection, the Department points out that the total prison population of the State of Florida of 28,000 there has been six reported cases of AIDS compared to 180 cases reported for the entire population of the State of Florida which is in excess of 10 million. Thus, the incidence of AIDS in prisons is at least 13% higher than in the population in general.

No one can deny, nor does the Trustee, that the program involves some risks.

To rebut these ostensible damaging facts presented by the Department, the Trustee relies on the fact that the plasmapheresis program always had some risk involved even prior to the discovery of AIDS; most notably, possible transmission of malaria and yellow jaundice or viral hepatitis; that the program has been approved by the appropriate health agencies; that all precautions to prevent transmission of any infection, either AIDS or other illnesses, are taken by an alcohol treatment of all plasma with the exception of Factor VIII and now, recently, by the heat treatment; that the donor selection program via questionnaire and the appropriate medical examination has been approved by the health agencies. In light of these undisputed facts it is the contention of the Trustee that the benefits obtained from the plasmapheresis program namely, the availability of source plasma, a life saving therapeutic agent when balanced against the still theoretical risk leaves no doubt that the Trustee should be permitted and authorized to assume this particular contract. In this connection it is urged by the Trustee, although there is no evidence in this record, that source plasma is only available from paid donor programs because volunteers do not participate in plasmapheresis programs and donate nothing but whole blood. It is intimated that if this program is not permitted to continue, the availability of source plasma would be severely restricted and reduced and the only source remaining would be the street centers which are equally as susceptible to producing contaminated blood. Since street centers are permitted to function and operate, there is no reason or justification to discriminate against a plasmapheresis program conducted in correctional institutions.

As noted earlier, none of these contentions are supported by the evidence. First, it is not difficult to assume that the environment in street centers and the environment in the strictly controlled high-security correctional institutions are totally different and the likelihood of incidences of homosexuals participating in the program is far greater in a correctional institute than in the street centers. Be that as it may, it is well established that the inmate population represents a high risk group, a proposition which is now well established by statistics not only in this State, but also in others such as Illinois where the paid donor program at correctional institutes has been discontinued because of the danger of transmission of AIDS. It is noteworthy that today only the States of Florida and Louisi-

ana permit plasmapheresis programs to be conducted in correctional institutions.

Next, the Trustee contends that this Court should not be involved in a basic policy formulation concerning the soundness of the program. To consider this proposition it is well to state at the outset that it is well established that courts should generally not be involved in evaluating the soundness of any programs affecting human health and such matters should be left to agencies specially established by the Legislature to deal with these problems. Approval of drugs, programs and procedures dealing with health have been allocated by Congress to the FDA. To achieve the ultimate goal of the congressional design, the FDA was given extensive broad powers and direction to approve or disapprove any productions, programs or procedures which may affect human health.

Based on the foregoing, it is urged by the Trustee that a determination whether or not such practice, that is a program involved in this particular instance can be conducted consistent with sound medical practice is a matter to be determined either by the legislature or by the appropriate health agencies to whom the matters of health and safety are entrusted by the legislature and this Court should not be involved in such a determination because the appropriate agencies are more equipped and possessed with the technical know-how and the relevant scientific knowledge to determine whether or not certain practices, programs or procedures are sound and should not be permitted to continue.

Lastly, the balancing of the respective benefits against possible detriments which might result if the program is resumed as suggested by the Trustee is not really appropriate. This is so because what is to be balanced here is not a potential risk of spreading AIDS against the benefits to society at large through the availability of source plasma, but the benefits to this Debtor which is nothing more than economic benefits matched against the possible serious, and in the case of AIDS fatal, consequences of any infections which might oc-

cur as a result of the continuing operation of the plasmapheresis program at the correctional institute. When one considers this contract from this standpoint, there is no doubt that in light of the currently existing status of affairs, it would be unsound to permit this operation to continue until scientific studies establish either that the agent of AIDS is a virus which could be killed by the alcohol treatment of the plasma or it is established that AIDS is not transmitted through blood, but primarily or solely by sexual conduct. For this reason, the Trustee's Application to Approve this executory contract cannot be approved at this time. This Court realizes that this would severely damage the economic health of this Debtor and will lose the apparently advantageous contract, but this Court is satisfied that there is a risk involved which is too high and the discontinuance of this program will, in a small measure, assist and help the prevention of the spread of the dreaded disease of AIDS.

This contract requires Southern Biotech to conduct the contract in accordance with "good and sound medical practice." This is the covenant which, in light of this record the Trustee is unable to perform, and since the assurance of future performance is an indispensable prerequisite to the assumption of an executory contract by virtue of § 365(b)(1)(C) of the Bankruptcy Code, the Application to Assume cannot be approved.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Application to Assume Executory Contract filed by the Trustee be, and the same hereby is, denied.