**In re WESTVIEW 74TH STREET DRUG CORP., t/a Park Hill Pharmacy, Linden Hill Rx Center, Mitchell Chemists, Pharmasave, f/t/a Leroy Pharmacy, Debtor.**

**Bankruptcy No. 85 B 10979 (BRL).**

United States Bankruptcy Court, S.D. New York.

April 11, 1986.

As Corrected April 14, 1986.

leave to assume its lease for its Manhattan store. It is supported in its endeavor by S & P Drugs, a creditor with a large unsecured claim against the estate, and by the committee of unsecured creditors.[1] The landlord, 229 West 74th Street Corporation, opposes the motion, arguing that the lease has been terminated by virtue of the debtor's failure to pay certain post-petition real estate taxes within the first 60 days following commencement of the bankruptcy case and that, if the lease has not been terminated, the debtor has failed to demonstrate adequate assurance of its future performance under the lease, as required by 11 U.S.C. § 365(b)(1)(B). Evidentiary hearings were conducted on January 14, 15 and 16 with Westview offering the testimony of two witnesses. At the conclusion of Westview's case, the landlord moved to dismiss. It declined to adduce any evidence in support of its own position. For the reasons which follow, we deny the motion to dismiss and grant Westview's motion subject to payment of interest on the unpaid additional rent and to payment of reasonable attorneys' fees after submission by the landlord of an application therefor and a hearing thereon.[2]

Grutman Miller Greenspoon Hendler & Levin, New York City by Leo Fox, for debtor.

Windels Marx Davies & Ives, New York City by Roy H. Carlin, for landlord.

Jules Teitelbaum, P.C., New York City by Theodore Donovan, for S & P Drugs.

## OPINION ON DEBTOR'S MOTION TO ASSUME ITS LEASE

TINA L. BROZMAN, Bankruptcy Judge.

Westview 74th Street Drug Corp. ("Westview"), the debtor in this chapter 11 case, moves under 11 U.S.C. § 365 for

### I.

Prior to commencing its chapter 11 case on June 13, 1985, Westview operated three retail drug stores, one each in the Bronx, Queens and Manhattan. Tr. at 26. Pursuant to orders of this court the lease for the Bronx store was rejected and the Queens store was surrendered to a secured creditor in exchange for the release of some $320,-000 of secured debt. Tr. at 27. The Manhattan store is now the debtor's sole operation. Tr. at 28.

By Order to Show Cause dated October 4, 1985, Westview sought from this court a second 60 day extension of time to assume

---

1. The committee of unsecured creditors did not actually appear but instead authorized Westview to indicate to the court that the committee supports Westview's motion.

2. The reorganization case is assigned to Bankruptcy Judge Lifland. In his absence, this court entertained Westview's second motion for an extension of time to assume or reject its lease. Because of the interrelationship between that motion and the instant motion, this court, rather than Judge Lifland, is entertaining the motion to assume.

or reject its lease for the Manhattan store. The landlord opposed, arguing, as here, that the lease had been forfeited when Westview failed to pay certain post-petition real estate taxes due as additional rent within the first 60 days following commencement of the chapter 11 case. Following an evidentiary hearing at which it was established that Westview's failure to pay an almost three-fold increase in such taxes was attributable to the landlord's recalcitrance in providing a copy of the actual tax bill (a request by the debtor which was certainly reasonable and prudent in view of the dramatic increase which the landlord sought), this court, for cause, extended the time to assume or reject the lease. In so doing, the court reserved for the landlord a variety of protections, including directing Westview to pay the taxes upon presentation of a tax bill, directing Westview to timely perform all of its rental and other obligations under the lease, providing that the landlord's acceptance of Westview's performance would not constitute a waiver of the landlord's rights and providing that the extension of time granted was without prejudice to any application by the landlord to seek to reduce the extension for cause. That order is presently on appeal.

Prior to the expiration of the extended period to assume or reject the lease, Westview moved for leave to assume, offering to post as security two months' rent. Westview contends, and the landlord does not dispute, that there are currently no defaults under the lease, Westview having duly tendered the sums required under the court's prior order as well as all continuing obligations under the lease. However, the landlord urges that it is entitled, by virtue of 11 U.S.C. § 365(b)(1)(B), to a reasonable attorney's fee and to interest on the late post-petition tax payment.

At the inception of the lease in 1978, Westview extensively remodeled the premises, at a cost of approximately $75,000, to render them suitable for use as a drug store; previously, they housed a shoe store. Tr. at 28–29. The drug store, which comprises some 3,500 square feet and a full basement, now contains sections carrying health and beauty aids, cosmetics and prescription drugs. Tr. at 28. Since terminating the operations at the other two locations, Harold Schechner, Westview's president, has spent all of his working time at the Manhattan store, concentrating on increasing sales and reducing expenses. Other family members assist, Mrs. Schechner working in the office, and their son and daughter, in the store. In addition, Westview employs approximately 15–18 persons full or part-time. Tr. at 34–36.

It appears from the evidence adduced that Westview has been a good tenant. Notwithstanding its financial embarrassment, it remained current on all pre-petition obligations due under the lease except for one $1,200 payment of additional rent representing half of the real estate taxes for the 1984–85 tax year. Tr. at 36, 157–58. The landlord did not make, prior to the bankruptcy, any demand for payment of that small outstanding sum which, in fact, was paid to the landlord in November 1985 (apparently without an order of this court, which was a proper predicate for the payment). Tr. at 158. Subsequent to the filing of its bankruptcy case, Westview continued to make timely payments of its obligations under the lease except for additional rent representing taxes sought by the landlord in July, 1985 for 1985–1986. Tr. at 160–63. The landlord ignored Mr. Schechner's request for a copy of the actual tax bill to substantiate the amount billed by the landlord and did not provide a copy until after this court directed it to do so. Tr. at 160–63. In accordance with this court's order, after the tax bill was furnished, those taxes were paid or tendered, half in October 1985 and the remainder in December 1985. Tr. at 161. Westview's pre-petition record of performance was such that it was able to avail itself of a provision in its lease which permitted Westview if it were not in default or in breach of the lease, to have its security deposit of $11,875 applied in the 37th month against rent and additional rent; thus, at the present time, the landlord has no security. Tr. at 159–60; Debtor's Ex. 8 at ¶¶ 31, 44 and 45.

Since the bankruptcy case began, Westview's monthly operations have consistently yielded a profit, albeit small, before provision for depreciation and income taxes, which profit has increased substantially with the abandonment of the Bronx and Queens locations. Tr. at 50–52, 58, 60, 64–66, 68, 105, 108, 110–113; Debtor's Exhibits 1–6. As a result of concessions obtained by Westview's committee of unsecured creditors, beginning in December the payroll was to be decreased by approximately $4,800 per month, thereby increasing net income. Tr. at 114–15. Thus, from an historical perspective, it would appear that Westview would have no difficulty in meeting its operating expenses, assuming that it had no prior debt to retire. Indeed, its accountant Mr. Eisenberger testified that Westview's net profit based on gross sales should run at about ten percent Tr. at 118.

Whereas Westview does have substantial pre-petition indebtedness including approximately $250,000 in sales taxes, $150,000 in partially secured debt owed to S & P Drugs, $40,000 in secured debt owed to Chemical Bank and significant unsecured debt (as well as estimated administrative debt of some $100,000), Westview has made much progress towards reorganizing and expected to have been in a position to file a plan of reorganization by January 31, 1986.[3] Tr. at 37–41, 118–120. Indeed, agreements have been reached to pay both S & P Drugs and Chemical Bank over three years and to pay unsecured creditors approximately $75,000 (equal to ten percent of their debt), half on confirmation, one-quarter a year later, and the last quarter two years later. Tr. at 37–39, 72–73. The sales taxes will be paid over time in accordance with 11 U.S.C. § 1129. Tr. at 132. The agreements with S & P Drugs and Chemical Bank have been reduced to writing and recently approved by the court.

The debtor did not dispute that its operations are insufficient to make all the payments contemplated under the plan, namely, the aggregate of the administrative expenses, the payment on confirmation to unsecured creditors and the various monthly payments (which should aggregate between $8,000 to $9,000). Tr. at 74 and 121. Mr. Schechner testified that a relative of his would be funding the shortfall; the debtor would pay so much of the monthly payments under the plan as its operations permit and the third party will pay the balance together with other payments due on confirmation of the plan. Tr. at 74–75, 89, 122. It is also anticipated that the third party will provide approximately $26,000 to Westview which will be utilized to remodel the Manhattan store. Tr. at 155–56. It was clear from the testimony adduced from both witnesses that the finer points of the third party funding are yet to be determined. No written agreement with the relative was produced nor was the relative's identity revealed.

Mr. Eisenberger testified that he believes that Westview's post-confirmation operations will permit it to make all of the monthly payments required under the proposed plan not only because of cost savings which have been made but because there has been a "remarkable increase" in the gross volume and sales of the store—from an average of $107,000 a month the sales have increased to in excess of $130,000 a month and will continue to increase if the trend indicated continues. Tr. at 126–27. He has projected that if the gross sales average $145,000 per month, or $1,700,000 for the year based on a ten percent net profit, the store should generate $170,000 in net income after payment of all expenses, which $170,000 would be available to make the $9,000 a month (or $108,000 per year) payments required under the plan, still leaving some $67,000 in profit or in additional funds available in the event that the projections prove a little inaccurate. Tr. at 129–31. As the accountant noted, whereas the debtor's net income from the Manhattan store alone was insuf-

---

**3.** It appears that subsequent to the closing of the record on this matter, Westview filed with the court a proposed disclosure statement and plan.

ficient in the months preceding the closing of the Bronx and Queens stores to carry the projected $9,000 a month which will be required under the plan, operations in November 1985 were sufficient to carry the payment. Tr. at 144–48; Debtor's Ex. 6.

The landlord admits that there are currently no defaults under the lease and does not challenge the debtor's assertion that, with the exception of one $1,200 payment of additional rent, the debtor had always remained current on its lease prior to bankruptcy such that its security deposit was applied to its rental obligations. Tr. at 21, 160, 173. What the landlord disputes is the continued existence of the lease and the debtor's ability to give adequate assurance of future performance thereunder. Tr. at 173, 176.

## II.

The first issue to be resolved is whether there remains any lease to be assumed by this debtor. In arguing that the lease has been forfeited, the landlord points to 11 U.S.C. § 365(d)(3), enacted in 1984, which obligates the trustee to timely perform with an exception not here relevant all the obligations of the debtor arising from and after the order for relief under any unexpired lease of nonresidential real property until such lease is assumed or rejected. The court may extend, for cause, the time for performance of any such obligation that arises within 60 days after the date of the order for relief, but the time for performance may not be extended beyond that 60 day period.

To understand the landlord's argument, this subsection of the statute must be read together with the next, § 365(d)(4), which provides, in pertinent part, that

if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60-day period, fixes, then such lease is deemed rejected, and the trustee shall

immediately surrender such nonresidential real property to the lessor.

The landlord argues that strict compliance under § 365(d)(3) is an absolute precondition to the granting of any extension of time under § 365(d)(4) and that as of the moment that the 60th day after entry of the order for relief ends, the lease is terminated if any post-petition obligations remain unpaid. What the landlord would have this court do is to engraft onto § 365(d)(3) a very harsh penalty for failure to fulfill any leasehold obligation—complete forfeiture of the leasehold interest.

That § 365(d)(3) contains no such forfeiture provision is beyond dispute. Certainly, Congress knew how to achieve a forfeiture had it intended one, for § 365(d)(4) deems a lease rejected upon failure to assume or reject it within 60 days or such extended period as the court fixes and directs the trustee to *immediately surrender* the leased nonresidential property to the lessor, without the necessity of any eviction proceedings under state law. But equally beyond dispute is the failure of § 365(d)(3) to prescribe any result for violation of its mandate. *See In re Southern Aircraft Services, Inc.*, 53 B.R. 805, 808 (C.D.Ca.1985). It is the determination of what type of relief is appropriate with which this court must grapple. Collier describes the problem succinctly:

The 1984 legislation added a new paragraph (3) to section 365(d) which requires the trustee to "timely perform all the obligations of the debtor" arising from and after the order for relief under any unexpired lease of nonresidential real property. The paragraph is silent as to the consequences of a failure to perform. Presumably one avenue of relief to the non-debtor party would be to seek to have any extension of the time within which to assume or reject under section 365(d)(4) terminated. While the genesis of section 365(d)(3) was an understandable impatience with trustees' delays in curing defaults and failure to preserve the status quo by making interim payments, the result is somewhat unrealistic

in major cases, particularly those under chapter 11.

2 L. King *Collier on Bankruptcy* ¶ 365.-03[2] at 365–31 (15th ed. 1985). Termination of the period in which to assume or reject, Collier's suggested appropriate remedy, does not work a forfeiture, for although the debtor may be forced to make a quick decision, it is not prevented from assuming the lease. Most assuredly, a debtor's failure to keep current on its post-petition obligations to its landlord is a factor which should weigh heavily in favor of limiting the debtor's right to maintain the lease in limbo, but the existence of such defaults should not effect an automatic termination of the leasehold interest.

This case is a good example of why it would be inappropriate to read into § 365(d)(3) a deemed rejection of a lease upon failure to make a post-petition payment within the first 60 days. The record unequivocally demonstrated that this debtor had acted in good faith by making all of the post-petition rental payments except for additional rent for its share of real estate taxes which payment it did not make because the landlord ignored its reasonable· requests for substantiation of the charge which was far in excess of previous bills.[4] To hold that under the facts of this case a right to assume was thereby forfeited would be clearly at odds with the equitable principles underlying the administration of bankruptcy, *Bank of Marin v. England*, 385 U.S. 99, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966). The clear trend of the cases has been to prevent a landlord from reaping a windfall at the expense of creditors through narrow judicial construction of section 365. *See By-Rite Distributing, Inc. v. Brierley (In re By-Rite Distributing, Inc.),* 55 B.R. 740 (D.Utah 1985); *In re Unit Portions of Delaware, Inc.,* 53 B.R. 83 (Bankr.E.D.N.Y.1985); *In re Bon Ton Restaurant and Pastry Shop, Inc.,* 53 B.R. 789 (Bankr.N.D.Ill.1985); *In re TFP Resources,* 56 B.R. 112 (Bankr.S.D.N.Y. 1985); *In re Bygaph,* 56 B.R. 596 (Bankr.S. D.N.Y.1986); *see also In re J.J. Melon's Inc.,* 57 B.R. 437 (Bankr.D.C.1985); *In re Curio Shoppes, Inc.,* 55 B.R. 148 (Bankr.D. Conn.1985); *but cf. In re Las Margaritas, Inc.,* 54 B.R. 98 (Bankr.D.Nev.1985) *In re Southwest Aircraft Services, Inc.,* 53 B.R. 805 (Bankr.C.D.Ca.1985).[5]

That the courts generally do not favor forfeitures is certain. *See Finn v. Meighan,* 325 U.S. 300, 301, 65 S.Ct. 1147, 1148–49, 89 L.Ed. 1624 (1945); *In re Queens Boulevard Wine & Liquor Corp.,* 503 F.2d 202, 204 (2d Cir.1974); *In re The Duplan Corporation,* 473 F.Supp. 1089, 1091 (S.D. N.Y.1979). As the Second Circuit explained in *Queens Boulevard,* in cases under the former Bankruptcy Act, which recognized at former section 70(b) the enforceability of bankruptcy termination clauses, the courts "created·two exceptions to mitigate the harsh consequences of what otherwise would be the absolute mandate of Section 70(b)." 503 F.2d at 204. First, some courts held that a landlord, by conduct evidencing an intent to affirm the lease, may waive the right to terminate or be estopped from asserting it.[6] And other

---

**4.** Indeed, a letter to the court from the landlord's counsel submitted in conjunction with settlement of the order extending Westview's time to assume or reject the lease admitted that the sum billed to Westview was in error. Westview's prudence in requesting substantiation is manifest.

**5.** Both *Las Margaritas* and *Southwest Aircraft* relied heavily on the bankruptcy court's decision in *By-Rite,* 47 B.R. 660, which was reversed at 55 Bankr. 740.

**6.** Inasmuch as the landlord here accepted payment of a pre-petition obligation for additional rent subsequent to the commencement of the bankruptcy, we might well find that the landlord had evidenced an intent to affirm the lease and waive its entitlement to adequate assurance of future performance. *See In re Harry C. Partridge, Jr. & Sons, Inc.,* 43 B.R. 669 (Bankr.S.D. N.Y.1984). We decline to do so, however, because the payment was apparently made without the authority of the court and in derogation of the policy of equality of distribution to creditors which pervades bankruptcy administration. *Cunard Steamship Company, Ltd. v. Salen Reefer Services, S.A.,* 773 F.2d 452, 459 (2d Cir.1985). To reward the debtor for making the unauthorized payment by finding a waiver on the part of the landlord would be to encourage disregard of statutory priorities and obligations.

courts held that they are empowered to refuse enforcement of lease termination clauses on the ground that termination would work a substantial injustice to the lessee and would serve only to frustrate reorganization efforts. 503 F.2d at 204–05 and cases cited therein. Indeed, *Queens Boulevard* expanded the second exception to embrace chapter 11 arrangement cases of privately owned corporations where possession by the debtor would not prejudice the landlord, except to deny it a windfall in the form of increased rent, but where enforcement of the forfeiture would deprive a debtor on the road to reorganization of the ability to reorganize by destroying its most valuable asset. 503 F.2d at 206–07.

■ With these cases as a backdrop we cannot help but conclude that it would be inappropriate for the judiciary to fashion a harsh rule of forfeiture where Congress did not provide one. Thus, we hold that the failure to meet a lease obligation required by section 365(d)(3) within the first 60 days after the date of the order for relief does not effect an automatic termination of the lease. Rather, the appropriate remedy for such a failure is one which should be formulated by the court after a review of the facts of the particular case.

### III.

Having determined that the lease was not terminated, we turn next to the landlord's contention that Westview should be prohibited from assuming the lease because the landlord has not been offered adequate assurance of future performance thereunder. We begin the analysis by noting that the landlord no longer has any contractual right to a security deposit but has nonetheless been offered two months' rent by the debtor to ease whatever lingering doubts might exist with respect to its ability to fulfill its continuing contractual obligations.

■ Section 365(a) of the Code in conjunction with section 365(b)(1) vests a debtor in possession with the absolute right to assume an unexpired lease and to cure any defaults, subject to the court's approval.

*In re Lionel Corp.*, 29 B.R. 694, 696 (Bankr.S.D.N.Y.1983). The aim of the statutory authority to assume a lease is to assist in the debtor's reorganization effort. *In re Bon Ton Restaurant & Pastry Shop, Inc.*, 53 B.R. 789, 792 (Bankr.N.D.Ill.1985). In the absence of a default, the debtor is entitled as a matter of course to assume a lease which appears to be in the best interests of the estate. *Bon Ton*, 53 B.R. at 793; *In re Sapolin Paints, Inc.*, 20 B.R. 497, 508 (Bankr.E.D.N.Y.1982); *Lionel*, 29 B.R. at 696. Where there has been a default, either pre-or post-petition, *Bon Ton*, 53 B.R. at 793, *In re Luce Industries, Inc.*, 8 B.R. 100 (Bankr.S.D.N.Y.1981), *rev'd on other grounds*, 14 B.R. 529 (S.D.N.Y.1981), the debtor in possession may not assume an unexpired lease unless, at the time of assumption, it cures or provides adequate assurance that it will promptly cure the default, it compensates, or provides adequate assurance that it will promptly compensate the landlord for any actual pecuniary loss resulting from the default and it provides adequate assurance of future performance under the lease. 11 U.S.C. § 365(b)(1).

■ The words "adequate assurance of future performance" are not words of art but were intended by Congress to be given a practical, pragmatic construction. *In re Sapolin Paints, Inc.*, 5 B.R. 412, 420–21 (Bankr.E.D.N.Y.1980). "As designed by Congress, the phrase does not mean absolute insurance that the debtor will thrive and make a profit." *In re Natco Industries, Inc.*, 54 B.R. 436, 440 (Bankr.S.D.N.Y.1985), citing *In re Alipat, Inc.*, 36 B.R. 274, 278 (Bankr.E.D.Mo.1984). The test is not one of guaranty but simply whether it appears that the rent will be paid and other lease obligations met. *Natco*, 54 B.R. at 440; *see In re Evelyn Byrnes, Inc.*, 32 B.R. 825, 829 (Bankr.S.D.N.Y.1983); *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr.S.D. N.Y.1982).

Some protection of the landlord, rather than improvement of its position, is the key to an understanding of the aims of section

365. Judge Buschman of this district aptly explained those aims:

It is only on default that a landlord is entitled to adequate assurance, § 365(b)(1), and the obvious purpose of this section, particularly in light of the statutory voiding of bankruptcy default clauses contained in § 365(e)(1), is to afford landlords with a measure of protection from having to be saddled with a debtor that may continue to default and return to bankruptcy.

The emphasis is on protection. Section 365 gives no indication that a landlord ... is to improve its position upon the bankruptcy of a tenant. The statute affords no relief to a landlord simply because it might have the opportunity to rent the premises to others at a higher base or percentage rent and would otherwise seek to escape the bargain it made.

*Natco,* 54 B.R. at 440–41 (citation omitted).

█ In determining whether the rent reserved in a lease will be paid, in addition to considering the source of payment the court must pay particular attention to the extent and history of defaults and the record of making prior payments. *See Natco,* 54 B.R. at 440. Here, the debtor's record is an exemplary one. First, its pre-petition default, which was never raised by the landlord, was miniscule. Second, its pattern of timely performance enabled it to eliminate a security deposit. Third, its post-petition default was promptly cured upon the rendition of the requested substantiation. Moreover, save for the real estate taxes in the form of additional rent, the debtor's post-petition obligations to the landlord were timely met. The payment history above is strongly suggestive that the rent reserved in the lease will be paid.

█ The testimony of the accountant, which this court finds to be entirely credible, buttresses the conclusion that the rent will likely be paid. Monthly operations have been marginally profitable during bankruptcy. Sales have increased and appear to be continuing to do so. Unprofitable stores have been closed, operating expenses have been reduced and the debtor's

principal is now devoting his full attention to the remaining store, located in the landlord's premises. Although as of the date the record was closed no agreement had been reduced to writing committing the third party to inject funds into the estate, in light of the debtor's past performance and the changes in its operations, this does not appear as in to be a prerequisite to a finding of adequate assurance of future performance as in *In re Luce Industries, Inc,* 14 B.R. 529 (S.D.N.Y.1981). There, a debtor-in-possession's proposal to assume a contract was, in actuality, an attempt to assign a licensing agreement to a subcontractor, with the debtor acting merely as a conduit. The court found that loss of the license would not necessarily put the debtor out of business and that no firm commitment had been made by any persons to furnish the money to the debtor necessary to cure its substantial defaults under the licensing agreement. Accordingly, the court reversed the bankruptcy court's approval of the assumption holding that "[u]nder the facts of this case at least," a firm commitment to fund the back debt to the licensor would be essential to adequate assurance under section 365. Here, there are no longer any defaults under the lease and the lease is essential to the operation of the debtor's business. Moreover, the landlord is more than adequately protected by the offered posting of two months' security. Should the debtor's operations fall short of its expectations and the debtor therefore default or should the third party funding evaporate such that no plan can be confirmed, the landlord should have an ample cushion to allow it to seek appropriate relief without pecuniary loss. We thus hold that Westview has satisfied its burden of furnishing the landlord with adequate assurance of future performance under the lease.

### IV.

We turn last to the landlord's entitlement to interest on the late post-petition additional rent payment and to attorneys' fees.

■ Pointing to *In re Taddeo*, 685 F.2d 24 (2d Cir.1982), Westview argues that the cure provisions of § 365(b)(1) require that the "cure need address only the individual event of default thereby repealing the contractual consequences." *Id.* at 27. The debtor misconstrues this language, which applies to the *cure* provision of section 365 and not to the provision of the statute requiring that the landlord's pecuniary loss be assuaged.

The landlord urges that attorney's fees should be paid pursuant to the express agreement contained in paragraphs 18 and 19 of the lease. The former provides in pertinent part:

18. In case of any such default, re-entry, expiration and/or dispossess by summary proceedings or otherwise, (a) the rent shall become due thereupon and be paid up to the time of such re-entry, dispossess and/or expiration, together with such expenses as Landlord may incur for legal expenses, attorneys' fees, brokerage, and/or putting the demised premises in good order, or for preparing the same for re-rental;....

The "such default" language apparently refers to paragraph 17, entitled "Default," which provides in germane part at subparagraph 2:

[I]f Tenant shall make default in the payment of the rent reserved herein or any item of additional rent herein mentioned or any part of either or in making any other payment herein required; then and in any of such events Landlord may without notice, re-enter the demised premises either by force or otherwise, and dispossess Tenant by summary proceedings or otherwise, and the legal representative of Tenant or other occupant of demised premises and remove their effects and hold the premises as if this lease had not been made, and Tenant hereby waives the service of notice of

intention to re-enter or to institute legal proceedings to that end.

Paragraph 19 provides in part:

19. If tenant shall default in the observance or performance of any term or covenant on tenant's part to be observed or performed under or by virtue of any of the terms or provisions in any article of this lease, then unless otherwise provided elsewhere in this lease, landlord may immediately or at any time thereafter and without notice perform the obligation of tenant thereunder, and if landlord ... in connection with any default by tenant in the covenant to pay rent hereunder, makes any expenditures or incurs any obligations for the payment of money, including but not limited to attorney's fees, in instituting, prosecuting or defending any action or proceeding, such sums so paid or obligations incurred with interest and costs shall be deemed to be additional rent hereunder and shall be paid by tenant to landlord within five (5) days of rendition of any bill or statement to tenant therefor, and if tenant's lease term shall have expired at the time of making of such expenditures or incurring of such obligations, such sums shall be recoverable by landlord as damages.

The cases considering claims such as the landlord's here have consistently recognized that an express contractual provision for attorney's fees gives rise to a right to obtain a reasonable attorney's fee as part of curing the debtor's default and in compensation for the landlord's actual pecuniary loss under section 365 of the Code. *See Andrew v. KMR Corporation, (In re Bullock)* 17 B.R. 438, 439 (B.A.P. 9th Cir. 1982); *255 Turnpike Associates v. J.W. Mays, Inc. (In re J.W. Mays, Inc.)*, 30 B.R. 769 (Bankr.S.D.N.Y.1983); *LJC Corporation v. Boyle*, 768 F.2d 1489 (D.C.Cir.1985); *cf. In re Masnorth Corp.*, 36 B.R. 335, 337–40 (Bankr.N.D.Ga.1984).[7]

7. At least one court has held that a creditor is entitled under section 365 itself to attorney's fees as part of a cure and assumption of a contract, without considering whether there is a contractual obligation to pay the fees. *In re Foreign Crating, Inc.*, 55 B.R. 53 (Bankr.E.D.N.Y. 1985). *Foreign Crating's* conclusion is not one with which we necessarily agree.

A provision in a lease requiring a tenant to pay his landlord for the legal fees and disbursements incurred in an action to enforce the payment of rent has long been judicially recognized as consistent with the public policy of New York. *Schechter v. Carter,* 580 F.Supp. 1526 (S.D.N.Y.1984); J. Rasch, *Landlord and Tenant Summary Proceedings,* § 358 at 449 (2d ed. 1971). But the attorney's fee must be reasonable and not in the nature of a penalty or forfeiture. *Weidman v. Tomaselli,* 81 Misc.2d 328, 365 N.Y.S.2d 681 (Co.Ct.), *aff'd* 84 Misc.2d 782, 386 N.Y.S.2d 276 (Sup.Ct. 1975). The right to recover expenses is contractual in nature, and the lease which serves as the entire contract must be construed to determine the latitude and scope of such contractual right. *Schechter v. Carter, supra,* 580 F.Supp. at 1529; *Village Leasing Corp. v. Arnold,* 58 Misc.2d 958, 959, 296 N.Y.S.2d 894, 895 (Civ.Ct., Queens Co. 1969).

In *Frank B. Hall & Co. of New York, Inc. v. Orient Overseas Associates,* 84 A.D.2d 338, 446 N.Y.S.2d 59 (1st Dep't), *aff'd,* 56 N.Y.2d 965, 453 N.Y.S.2d 680, 439 N.E.2d 395 (1982), the court construed substantially similar lease provisions to those contained here. The landlord sought to recover attorneys' fees incurred in the defense of a prior action for a declaratory judgment. The court read two provisions of the lease (akin to our paragraphs 17 and 18) together and held that in order to recover attorneys' fees, the landlord had to have undertaken some enumerated affirmative action (either by summary proceeding or otherwise) to re-enter the demised premises or to dispossess the tenant. Since defense of a declaratory judgment proceeding was not among the enumerated legal actions, the attorneys' fees clause was not triggered. Further, in reviewing a lease clause akin to our paragraph 19, the court held that for the landlord to recover attorneys' fees, it had to be performing for the account of the tenant the tenant's obligation to someone other than the landlord. Accordingly, the court ruled out a recovery of attorneys' fees on that basis as well.

■ Paragraph 19 of our lease, however, contains two significant differences from the provisions in *Hall.* There is no requirement that the landlord perform solely for "the account of Tenant" and the landlord is vested with the right to collect attorneys' fees "in connection with any default by tenant in the covenant to pay rent hereunder...." Because Westview did fail to pay additional rent under the lease and because the landlord opposed the extension of Westview's time to assume or reject the contract on the theory that the lease had been forfeited, opposition which was essentially meant to dispossess the tenant, we hold that the landlord is entitled to a reasonable attorneys' fee, the amount of which must await submission of an application for fees by the landlord and an evidentiary hearing thereon, if one be required. *See In re Ribs of Greenwich Village, Inc.,* 57 B.R. 319 (Bankr.S.D.N.Y.1986).

[9] With respect to the interest sought by the landlord, "[u]nder New York law, where there is a default in payment of rent, '[a] tenant is bound to pay interest on installments of rent from the time they become due.'" *J.W. Mays, Inc., supra,* 30 B.R. at 772 quoting J. Rasch,1 New York Landlord and Tenant, Summary Proceedings § 362 (2d ed. 1950) and citing *Bryant Park Building, Inc. v. Richmond,* 85 N.Y. S.2d 531 (Sup.Ct.N.Y.Co.1948). Since the contract is silent as to the rate of any interest which may be payable, this court awards the landlord interest at the legal rate on unpaid additional rent from the date payment was due until the date payment was tendered. *See* N.Y.C.P.L.R. §§ 5001, 5004; *United Bank Limited v. Cosmic International, Inc.,* 542 F.2d 868 (2d Cir.1976); *Astoria Federal Savings and Loan Association v. Rambalakos,* 49 A.D.2d 715, 372 N.Y.S.2d 689 (2d Dep't 1975).

Settle an appropriate order.