In re **MUIR TRAINING TECHNOLOGIES, INC., Debtor.**

Bankruptcy No. 89–06850–H7.

United States Bankruptcy Court, S.D. California.

Oct. 9, 1990.

Frederick Martin, Jr., Christison & Martin, San Diego, Cal., for Muir Training Technologies, Inc.

## MEMORANDUM DECISION

JOHN J. HARGROVE, Bankruptcy Judge.

Presently pending is the application of Christison & Martin ("applicant") for allowance of fees and reimbursement of costs as counsel for the debtor-in-possession in its Chapter 11 case, and later as counsel for debtor in its Chapter 7 case. At issue is the propriety and reasonableness of attorney's fees and costs charged by the attorney for the debtor-in-possession. Opposition was filed by administrative claimants Anacomp, Inc. and Park Atlanta North Associates.

This court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1334 and § 157 and the General Order No. 312–D of the United States District Court, Southern District of California. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B) and (O).

## FACTS

Applicant seeks court approval of compensation in the amount of $55,506.55 and reimbursement of expenses in the amount of $2,921.64 incurred representing the debtor-in-possession, Muir Training Technologies, Inc. ("Muir"), during its Chapter 11 proceeding from September 5, 1989 to December 21, 1989. Applicant also seeks approval of compensation in the amount of $3,089.50 and reimbursement of expenses in the amount of $70.41 incurred representing the debtor during its Chapter 7 proceeding between December 22, 1989 to January 30, 1990. This court previously ordered that applicant was allowed to draw down on its pre-petition retainer subject to surcharge and the approval of the principals of Muir.

Muir operated a technical college which specialized in computer training. Its financial troubles began when it started to suffer cash flow problems. Eventually its cash flow problems became persistent and severe, causing delinquencies and significant late charges. On September 5, 1989, Muir filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code.

Muir operated six campuses in San Diego, San Marcos, Palm Desert, Riverside, Albuquerque and Tucson. It entered into the following nonresidential leases for operation of its campuses:

| | LOCATION | TERM | MONTHLY RENTAL |
|---|---|---|---|
| a. | San Diego, California | 8/1/88–2/28/93 | $11,550.00 |
| b. | San Marcos, California | 2/6/89–2/6/91 plus 60 month addendum | 12,000.00 |
| c. | Palm Desert, California | 8/31/89–2/1/89 plus extension until 12/31/89 | 2,760.00 |
| d. | Tucson, Arizona | 2/5/88–3/31/90 | 6,457.50 |
| e. | Albuquerque, New Mexico | 4/15/88–4/14/95 | 6,787.08 |
| f. | Riverside, California | 7/25/88–7/25/91 | 14,490.00 |

After the petition was filed, Muir faced several minor crises. Some of the crises included: pre-petition employee payroll checks bouncing, loss of CAD software licenses, delinquent rent and a surprise inspection of records by the U.S. Inspector General. The most serious crisis faced by Muir occurred on October 10, 1989, when the Arizona State Board of Private and Post–Secondary Education ("Board of Education") placed the Tucson campus on probation. The principal ground for the probation was Muir's failure to advise prospective students that it filed for bankruptcy. The terms of the probation prohibited Muir from enrolling new students. Because the terms of the probation were so harsh, the existence of Muir was threatened. In an attempt to thwart this action by the Board of Education, applicant filed an application for a temporary restraining order, and later filed an application for a preliminary injunction on behalf of Muir.

On October 27, 1989, Muir's Board of Directors decided that due to the debtor's deteriorating financial condition, and the newly discovered unreliability of its books, the prospects for a reorganization were dim without either the sale of assets or an infusion of cash. It was also decided that if the debtor had not obtained a letter of intent from a serious, well qualified buyer by November 17, 1989, the case would be converted to Chapter 7.

On November 3, 1989, one week after the directors decided that the success of a reorganization through internal restructuring was impossible, and three days before the deadline within in which time the debtor's leases had to be assumed or deemed rejected, Muir petitioned this court to extend the time to assume or reject its six leasehold estates. At the time the motion was made, all of the Muir's rental payments were delinquent. The hearing on this motion was scheduled for December 15, 1989, a full month and a half after the motion was

filed, and almost a month after the self imposed deadline set for conversion. Neither Muir, nor any of the administrative claimants attempted to seek an earlier hearing date on the motion.

As a consequence of Muir's failure to perform its obligations under its leases, several of the lessors had difficulty paying the loans secured by their premises. In particular, the underlying lienholder of the Arizona leasehold initiated a trustee's sale against the limited partnership that owned the property. In addition, many of the premise's maintenance for common areas had suffered due to the lack of payment of Muir's pro rata portion.

At the hearing on the motion to extend, this court in effect denied Muir's motion to extend the time to assume or reject the unexpired leases and defer all post-petition rent obligations. The court ordered that the motion be granted, but *only* on the condition that the debtor cure all defaults on or before December 19, 1989, and keep current on all future payments. The court further ordered that failure to cure or keep current would result in the leases being rejected. Because Muir was unable to cure the delinquent rental payments, the case was converted to Chapter 7 on December 21, 1989.

## DISCUSSION

11 U.S.C. § 330(a) provides in pertinent part that the court may award to the debtor's attorney:

(1) reasonable compensation for actual, necessary services rendered by such ... attorney ... based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; and

(2) reimbursement for actual, necessary expenses.

Anacomp, Inc. argues that the fees and costs incurred as a result of the attempt to obtain an extension of the time allowed to assume or reject the nonresidential real property leases of the debtor are unreasonable and unnecessary within the meaning of 11 U.S.C. § 330. Applicant replies that

even if Muir's motion could be characterized as completely unsuccessful, this characterization would be irrelevant to the issue of compensation, arguing that a strict application of the "results achieved" argument would render bankruptcy counsel subject to a "double contingency" fee arrangement. Applicant further argues that applicant was merely following the instructions of Muir's Board of Directors.

At least one circuit court has suggested that the measure of reasonableness may be the degree to which the work performed increases the likelihood of success, so that spending time and money for little improvement in position is not reasonable. *Matter Central Ice Cream Co.*, 841 F.2d 732, 734–35 (7th Cir.1988). In order to determine the reasonableness of the fees incurred under the particular circumstances of this case, two major issues must first be discussed: 1) Whether the debtor-in-possession in a Chapter 11 proceeding must pay rent during the 60–day period for assumption or rejection of a non-residential lease pursuant to 11 U.S.C. § 365(d)(3); and 2) Whether the debtor-in-possession must continue to make rental payments during the 60–day decision period in order to obtain an extension pursuant to 11 U.S.C. § 365(d)(4). As will be shown, the answer to these questions is crucial in determining whether applicant's services have benefitted the estate.

### 1. DEBTOR'S DUTY TO PAY RENT PURSUANT TO SECTION 365(d)(3).

■ 11 U.S.C. § 365(d)(3) requires the debtor to perform all lease obligations while deciding whether to assume or reject the subject lease. Section 365(d)(3) states:

The trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, not withstanding section 503(b)(1) of this title. The court may extend, for cause, the time for performance of any such obligation that arises within 60 days after the date of the order

for relief, but the time for performance shall not be extended beyond such 60–day period.

In support of its position that the bankruptcy court has the power to defer lease obligations pending a determination of the debtor's ability to perform its obligations, Muir cited *In re Orvco, Inc.*, 95 B.R. 724 (9th Cir. BAP 1989).

*Orvco* does not support Muir's position. The issue in *Orvco*, was whether § 365(d)(3) required payment of contract rent for the post-petition 60–day period and the timing of such payment given rejection of the lease by the debtor. The court held that when a lease is deemed rejected, a lessor must establish its claim for administrative status under § 503(b)(1)(A). *Id.* at 728.

With respect to the right to immediate payment following rejection of the lease, the Bankruptcy Appellate Panel in *Orvco* stated:

> [T]hat after rejection of the lease, the payment of an administrative claim for rent, like all other administrative claims is within the sound discretion of bankruptcy court and shall be determined under Section 503.
>
> *Id.*

The directive of § 365(d)(3) requiring a debtor's timely performance of its obligations under any unexpired lease of nonresidential real property has been stated in at least two California cases. In the case of *In re Tandem Group, Inc.*, 60 B.R. 125, 127 (Bankr.C.D.Cal.1986), the court stated with regard to § 365(d)(3) that:

> "The only logical inference that can be drawn from these subsections is that to preserve the ability to assume the lease, the debtor, or trustee, must perform all lease obligations during the 60–day period and during any court authorized extension."
>
> *Id.* at 127.

*See also, In re Chandel Enterprises, Inc.*, 64 B.R. 607, 610 (Bankr.C.D.Cal.1986), (Timely payments under lease required by § 365(d)(3) during 60–day period and any extensions thereof). The express language of § 365(d)(3), its legislative history and the case law interpreting this section require a debtor or trustee to satisfy their lease obligations during the 60–day assumption/rejection period and any court authorized extension.

## 2. CAUSE MUST BE ESTABLISHED FOR AN EXTENSION OF THE 60–DAY PERIOD PRESCRIBED BY SECTION 365(d)(4).

Section 365(d)(4) sets forth the rule that unless an extension is granted "for cause", a debtor must assume or reject its nonresidential real property leases within 60 days after the filing of its petition. Section 365(d)(4) provides as follows:

> Notwithstanding paragraphs (1) and (2), in a case under any chapter of this title, if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60–day period, fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.

 Although the Code does not provide a definition for "good cause" for the extension of time within which to assume or reject nonresidential leases, a list of relevant factors was developed in *In re Wedtech Corporation*, 72 B.R. 464 (Bankr. S.D.N.Y.1987). The Ninth Circuit subsequently adopted the approach set forth in *Wedtech* in *In re Victoria Station Inc.*, 88 B.R. 231, 236 (9th Cir. BAP 1988).

The factors are as follows:

1) Whether the lease is the primary asset of the debtor;

2) Whether the lessor has a reversionary interest in the building built by the debtor on the landlord's land;

3) Whether the debtor has had time to intelligently appraise its financial situation and potential value of its assets in terms of the formulation of a plan;

4) Whether the lessor continues to receive rental payments and whether

the debtor fails to pay the rent reserved in the lease;

5) Whether the lessor will be damaged beyond compensation available under the Bankruptcy Code due to the debtor's continued occupation;

6) Whether the case is exceptionally complex and involves a large number of leases;

7) Whether need exists for judicial determination of whether the lease is a disguised security agreement;

8) Whether the debtor has failed or is unable to formulate a plan when it has had more than enough time to do so; and

9) Any other factors bearing on whether the debtor has had a reasonable amount of time to decide to assume or reject the lease. *In re Wedtech Corp.*, 72 B.R. at 471–472.

The *Wedtech* court stated that Congress in adding § 365(d)(4) "placed the burden on the debtors-in-possession to show cause why the time to determine whether to assume or reject should be extended." *Id.* at 469.

After analyzing and weighing various factors, the court in *Wedtech* held that cause existed for extension of the 60–period for assumption or rejection of the unexpired lease even though the debtor-in-possession failed to pay rent. *Id.* at 475–476. In order to understand why the court came to this conclusion it is important to comprehend the rather unusual facts that lead to it.

First, in *Wedtech*, the debtor's failure to pay rent during the 60–day period was a result of the criminality of former officers and directors. Thus, the *Wedtech* court is not unilaterally proscribing that an extension can be granted even though the debtor failed to pay its obligations under the lease. In fact, the court stated that a "debtor's failure to keep current on its post-petition obligations to its landlord is a factor which should weigh heavily in favor of limiting the debtor's right to maintain the lease in limbo." *Id.* at 475 (quoting *In re Westview 74th Street Drug Corp.*, 59 B.R. 747, 753 (Bankr.S.D.N.Y.1986)), *See also In re Bek-*

*er Industries Corp.*, 64 B.R. 890, 898 (Bankr.S.D.N.Y.1986) (Debtor's failure to perform post-petition obligations over a longer period of time carries greater weight than other factors.)

Second, the debtor had recently undergone a significant change in management which left it without sufficient time to decide whether to assume or reject. The principal officers had resigned less than a month after the petition was filed because they were the subject of a grand jury investigation concerning their relationships with numerous public officials.

Third, the debtor was uncertain whether the lease was a true lease or a security agreement because the debtor was a former owner of the property. Since this issue required judicial determination, the debtor contended that it was principally the presence this issue that constituted sufficient "cause" for the court to grant an extension of time.

Finally, the fact that Wedtech built the building and financed the improvements on the property was also a significant fact that the court took into consideration in determining that cause existed.

In this case, the leases in question were not the primary asset of Muir. Moreover, Muir had no reversionary interests in the buildings, nor were the buildings built by Muir. The lessors possessed the sole equitable and legal interest in and to the improvements on the subject properties.

Muir had sixty days, the standard time, to decide whether or not to assume or reject a lease. The leases were of no particular value to plan formulation since rental space in the markets where the campuses were located is relatively plentiful at market and below market rates due to the slow down in their commercial real estate markets. The lessors had not received any rental payments since the date of filing and many of the leases were in default prior to filing. At least one lessor may have been damaged beyond compensation available under the Bankruptcy Code because the premise's maintenance suffered due to Muir's failure to contribute its pro-rata

share. In addition, the Arizona lessor quite possibly suffered damage since the property was its sole asset and the underlying encumbrance holder had initiated a trustee's sale against the property. Finally, there were no other factors that mitigated in favor of continued occupancy by Muir, whereas additional factors, such as Muir's potential liability to meet administrative claims existed in favor of the lessors.

In support of its motion for an extension of the 60–day period set forth in § 365(d)(4), Muir relied heavily upon *In re Southwest Aircraft Services, Inc.*, 831 F.2d 848, 854 (9th Cir.1987), *cert. den'd,* 487 U.S. 1206, 108 S.Ct. 2848, 101 L.Ed.2d 885 (1988). In *Southwest Aircraft*, the Ninth Circuit Court of Appeals held that the failure of the bankruptcy court to conduct a hearing on a motion for an extension under § 365(d)(4) within 60 days after the petition date will not automatically result in deemed rejection of the lease, provided the motion is filed within the 60–day period. While it was clear that Muir had complied with the technical requirements of § 365(d)(4), as announced by the *Southwest Aircraft* court, by filing its motion prior to the expiration of the 60–day period, Muir must still establish "cause" for the extension requested.

The following reasons represent the arguments advanced by Muir in favor of an extension. First, Muir asserted that it needed additional time to determine whether its estate had sufficient assets to pay the amounts due under the leases. However, Muir intended to allow additional unpaid amounts to accrue under the leases while it arrived at its decision.

Next, Muir argued in favor of an extension by stating that it was in negotiations for the sale of either stock or assets of the business. No further detail about the terms of the contemplated sale, or even the stage of negotiations was discussed.

Finally, Muir cited to *Southwest Aircraft, supra,* for the proposition that the debtor's failure to make payments under 11 U.S.C. § 365(d)(3) "constitutes simply one element to be considered, along with all the other relevant factors, in determining whether cause exists under subsection (d)(4) to extend the 60–day period for assumption or rejection" of a lease. *Id.* at 854.

*Southwest Aircraft* is factually dissimilar to the present case. In *Southwest Aircraft*, Southwest tendered checks to the City of Long Beach for *all outstanding* rent at the hearing to extend the sixty day deadline for assuming or requesting its lease. The City refused the checks. In this case, Muir had not tendered any monies for rent for the additional sixty days and was requesting a total deferment of making any payments toward the rental obligation.

Muir's arguments for extension are unpersuasive because it has not satisfied its burden of showing "cause" for the extension. Muir's arguments are general and could apply to any debtor seeking to reorganization. The court in *Wedtech*, infra, stated that, "Congress obviously did not intend the cause requirement to be lightly dismissed or blindly applied." 72 B.R. at 469.

There are no Ninth Circuit or BAP opinions which expressly hold that in all circumstances a debtor must make rental payments during the 60–day period and any extension thereof. However, the failure to keep current on rental obligations weighs heavily in favor of *limiting* extensions of the time to assume or reject a lease. While bankruptcy courts, as courts of equity "are compelled to disfavor a lease forfeiture that would imperil the debtor's reorganization and would impede rehabilitative goals", *In re Victoria Station Inc.*, 840 F.2d 682, 684 (9th Cir.1988), it was counsel's actions in not seeking a timely disposition of Muir's motion while continuing to incur administrative rent, and not the conditional order of extension leading to lease forfeiture, which imperiled reorganization. In the cases surveyed, either the rent was paid, rent was tendered and refused, or there were adequate assurances that the rent would be paid when a court authorized an extension. None of those situations was present here. No effort was made by

Muir to lessen the burden on the landlords. Applicant took a gamble and lost. The other administrative claimants that have already suffered should not be required to pay for this.

Accordingly, this court holds that Muir's request to defer its obligations under its unexpired leases of nonresidential real property for an additional sixty days pursuant to its motion to extend the time to assume or reject its six nonresidential leases was not reasonable since it had shown no clear authority supporting its request and had failed to satisfy its burden of establishing causes as prescribed by 11 U.S.C. § 365(d)(4).

## LACK OF BENEFIT TO THE ESTATE

■ 11 U.S.C. § 330 authorizes compensation to professional persons who provide services to the debtor, trustee or creditor's committee. Section 330(a)(1) provides in pertinent part that after notice to any parties in interest and to the U.S. Trustee and a hearing, the court may award to the debtor's attorney reasonable compensation for actual, necessary services rendered by such attorney.

The court in *Matter of Ryan*, 82 B.R. 929, 931 (N.D.Ill.1987) interpreted this section to mean that as a matter of law, attorneys may recover fees from the estate only if their labors actually benefitted the estate. E.g. *In re Moore*, 57 B.R. 270, 271 (Bankr.W.D.Okla.1986); *Matter of Zweig*, 35 B.R. 37, 38 (Bankr.N.D.Ga.1983); *In re Rosen*, 25 B.R. 81 (Bankr.D.S.C.1982).

The court in *In re Tinsley & Groom*, 49 B.R. 94 (Bankr.W.D.Ky.1985) applied this principle in determining the compensation of a debtor's attorney in a Chapter 11 proceeding where the success of the reorganization of the debtor was totally dependent upon the success or failure of an adversary proceeding testing the validity of the "full proceeds" of a loan.

The *Tinsley* court held that the debtor's counsel was not entitled to compensation for services attributable solely to the unsuccessful adversary proceeding even though counsel was capable, experienced and acted in good faith, because counsel's

efforts did not enhance the estate of the debtor. *Id.* at 98.

In denying compensation to the debtor's attorney, the court stated that if counsel had reached a favorable resolution of the adversary proceeding:

[H]is efforts would have substantially benefitted the debtor and the creditors. His compensation would have been substantial and justified. However, since these efforts proved completely unsuccessful, and, in fact, did not further enhance the administration of this estate, entitlement to administrative compensation from the estate for these services is not appropriate and will be accordingly denied.

*Id.* at 97.

The court further commented that it was unfortunate that the debtor's counsel could not be compensated for the services rendered in connection with the adversary proceeding since this litigation was necessary to achieve reorganizational potential. However, the court "must of necessity apply the well-established criteria" in determining the allowability of compensation. *Id.* at 98.

Other decisions have reached the same result. The court in *In re S. & E. Oil Co. Inc.*, 66 B.R. 6 (Bankr.W.D.La.1986), held that a reduction of twenty percent of fees for the attorney for the debtor-in-possession was appropriate where long prior to conversion it should have been obvious to counsel that the debtor would not be able to reorganize. The *S. & E.* court criticized counsel for allowing "the tail to wag the dog", ie. allowing the client to create unnecessary and costly delays in the administration of the case. *Id.* at 8.

In *In re G.W.C. Financial & Ins. Services, Inc.*, 8 B.R. 122 (Bankr.C.D.Cal.1981) the court ordered the debtor's attorney to return a portion of the fees previously paid noting that the new Bankruptcy Code "should not be taken to encourage counsel to file a Chapter 11 case with only a vague hope that something might turn up in the future by way of a plan and then try to justify a large retainer by largely unproductive services." *Id.* at 125.

The important factor of "results obtained" may lead the district court to adjust the fee upward or downward. *Matter of Mansfield Tire & Rubber Company*, 65 B.R. 446, 453 (Bankr.N.D.Ohio 1986). The issue to be discussed is whether the results obtained makes the hours expended a satisfactory basis for making a fee award.

The Supreme Court in *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1982), discussed the "results obtained" analysis, and stated:

> If ... a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith. Congress has not authorized an award of fees whenever it was reasonable for a plaintiff to bring a lawsuit or whenever conscientious counsel tried the case with devotion and skill. Again, the most critical factor is the degree of success obtained.
>
> \* \* \* \* \* \*
>
> There is no precise rule or formula for making these determinations. The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment.

*Id.* at 436–437, 103 S.Ct. at 1941. While this analysis was undertaken in connection with an award of fees under the Civil Rights Attorney's Fees Awards Act of 1976, it is applicable to an award under 11 U.S.C. § 330, since under both provisions, the fees must be reasonable.

This court is now faced with a decision of who is more worthy of the remaining assets, the applicant or the other administrative claimants. The Chapter 11 proceeding in this case was unreasonably prolonged by applicant's last minute motion to extend time to assume or reject debtor's leasehold estates. The motion was filed only two days before the 60–day period provided by § 365(d)(4) would expire. The hearing was scheduled 43 days later, with no effort to obtain an earlier court date made by emergency application, or to have the court hear the request for an extension on an ex parte basis, effectively giving Muir a total of 102 days on the landlord's property without paying rent. This last minute (Board of Directors meeting of October 27, 1989) strategic planning by the Muir and its counsel resulted in the estate suffering significant rental obligations and substantial attorney's fees to draft and defend its motion [1].

Applicants presented no evidence, such as contact from or negotiations with joint venture partners who would provide new capital or a buyer who would buy the debtor's assets, that would have supported Muir's request for an extension without payment of rental obligations. There simply was no evidence revealing any reasonable prospect of reorganization during the extension period. It appears that the decision to obtain an extension to assume or reject the debtor's leases was made simply to "buy time" during which something might turn up.

Moreover, the applicant failed to timely convert the case to Chapter 7. This court believes that it should have been obvious to the applicant that for some time prior to conversion that Muir would not be able to successfully reorganize. At the very least it should have been self-evident to the applicant on November 17, 1989, since this was its own self-imposed deadline for conversion. The case should have been converted on this date [2]. Instead, the Chapter 11 proceeding was prolonged until December 21, 1989. There is no apparent reason

---

1. At the time of the fee application, it was uncertain whether there were sufficient assets available to pay the Chapter 11 administrative expenses.

2. Applicant's time sheets indicate that research on voluntary conversion started on October 31, 1989; that a conference was held on November 1, 1989 to discuss conversion; and that a meeting took place with a potential trustee in early November 1989. Further, applicant drafted an ex parte motion for conversion and proposed order on November 6, 1989.

why the case was extended. Because applicant failed to timely convert the case when it was clear that there was no hope of reorganization and the estate suffered substantially from this failure, this court believes the other administrative claimants are more worthy of the remaining assets.

■ The fee application submitted by applicant states that applicant expended approximately 69 hours on leasehold issues and landlord litigation. This entailed all aspects of dealing with counsel for seven landlords at six campuses in three states, preparing debtor's motion for extension of time within which to assume or reject executory real property contracts, responding to landlords' opposition, and attending a hearing on the motion. A close review of the time sheets indicates however, that a total of 127 hours [3] were incurred relating to real property lease issues. This is broken down to 64.6 hours at $175 an hour, and 62.4 hours at $100 an hour for total fees of $17,545. Accordingly, this court shall disallow $17,545 of the total fees requested by applicant. Taking into consideration the retainer of $25,000 it received on September 1, 1989, this court will allow applicant $12,961.50 in payment of Chapter 11 fees for a total fee award of $37,961.50. In addition, this court will allow reimbursement of expenses totalling $2,921.64 in representing Muir during its Chapter 11 proceeding. Further, the request for compensation of $3,089.50 and reimbursement of expenses totalling $70.40 in representing the debtor during its Chapter 7 proceeding is allowed as prayed.

## CONCLUSION

This Memorandum Decision constitutes findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. Counsel for Muir is directed to file with this court an Order in conformance with this Memorandum Decision within ten (10) days from the date of entry hereof.

---

**3.** Many of the services were lumped together into a single time entry making it difficult for the court to determine the actual time spent on the lease issue, as opposed to other issues. Where lumping occurred, the court included the complete time entry in his calculation of total hours incurred on the lease issue. Each type of service is required to be listed with the corresponding specific time allotment, otherwise, the court would be unable to determine the reasonableness of a specific task. Services which have been lumped together may be disallowed. *In re Wildman,* 72 B.R. 700, 709 (Bankr.N.D.Ill.1987).