**In re NATCO INDUSTRIES, INC., et al., Debtors.**

**Bankruptcy Nos. 85 B 10555–85 B 10637.**

United States Bankruptcy Court, S.D. New York.

Oct. 24, 1985.

Levin & Weintraub & Crames, P.C., New York City, for debtors-in-possession; Richard S. Miller, of counsel.

Ballon, Stoll & Itzler, New York City, for Creditors Committee; Michael Z. Brownstein, of counsel.

Bruce L. Roswick, New York City, for Nashland Associates.

Rosenman, Colin, Freund, Lewis & Cohen, New York City, for the Primac Center Associates, Inc., et al.; Jane Solomon, of counsel.

Wolf, Block, Schorr, and Solis-Cohen, Philadelphia, Pa., for Depford Mall and Neshaminy Associates; Michael L. Temin, of counsel.

Honigman, Miller, Schwartz & Cohn, Detroit, Mich., for Forbes Cohen Properties; Steven G. Howell, of counsel.

## DECISION

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

Natco Industries, Inc. and its 83 affiliates ("Debtors") seek an order pursuant to § 365 of the Bankruptcy Code 11 U.S.C. § 365 (1984) ("the Code") permitting the assumption of certain leases for store premises. The landlords of these leases object on the ground that the Debtors have not demonstrated adequate assurance of future performance under the leases.

I

Prior to filing petitions for reorganization under Chapter 11 of the Code on April 18, 1985 the Debtors leased approximately

210 retail stores through which they sold men's garments.

By application dated May 7, 1985, the Debtors timely sought an order from this Court extending the Debtors time to assume or reject each of the 210 leases pursuant to § 365(d)(4) of the Code, through the date of the entry of an order confirming a plan of reorganization.

A hearing was held on June 11, 1985. With regard to the leases of lessors who opposed the application, the Court extended the Debtors' time to make a motion to assume or reject for cause based on the evidence presented, to September 4, 1985.

Such a motion was made on August 25, 1985. The Debtors seek an order authorizing assumption of the leases for store numbers 23, 200, 223, 244, 248, 249, 280, 282, 301, 304 and 403. Performance of individual debtors with respect to these eleven leases is guaranteed by the parent company, National Shirt Co. Inc. ("National Shirt"). They are among the 70 retail stores which the Debtors plan to keep in operation. The Debtors assert that each of these leases is necessary for its successful reorganization.

The Debtors were last profitable on a consolidated basis in 1983. Tr. at 45. In 1984, they were not profitable (ibid.), suffering from an inability to obtain sufficient merchandise for its numerous retail locations. Carl Simon, vice-president and treasurer of the Debtors, testified that this inability lead to an "image" change, which resulted in a loss of patronage. In addressing this problem and reducing overhead and expenses during the pendency of these Chapter 11 cases, the Debtors have closed several stores, keeping open those which historically were profitable. Those retail stores were restocked with merchandise of a quality and quantity designed to attract their previously existing customer base. Tr. at 31–32. The Debtors predict that a period of 6 to 18 months will be required to recover sufficient identity within the marketplace to equal or surpass their previous market status.

Notwithstanding their failure to operate profitably on a consolidated basis since the fiscal year ending December 31, 1983, the Debtors remained current on all pre-petition obligations due under all of the leases except for payments for rent or additional rent for the period immediately prior to the filing date. Those payments were either blocked by the commencement of these Chapter 11 proceedings or represent pre-petition amounts due the landlords pursuant to invoices rendered to the Debtors subsequent to the filing date. Tr. at 37–38. With respect to the eleven leases in issue here those amounts are:

| Store # | Annual Base Rent | Amount of Default as of 7/31/85 |
| --- | --- | --- |
| 23 | $18,536.00 | $1,717.54 |
| 200 | $27,500.00 | $336.25 |
| 222 | $27,750.00 | $138.91 |
| 244 | $31,161.83 incl. utility | $593.08 |
| 248 | $15,495.00 | 0.00 |
| 249 | $15,500.00 | $642.53 |
| 280 | $22,942.50 | $55.74 |
| 282 | $20,000.00 | $492.82 |
| 301 | $18,429.00 | $2,164.15 |
| 304 | $20,400.00 | $16.77 |
| 403 | $14,000.00 | 0.00 |

Debtors Application, Exhibits A and B.

While the Debtors have lost money since the commencement of their Chapter 11 cases, they have continued to meet the post-petition rental obligations in each of the store leases. Tr. at 70.

The Debtors expect to confirm their Consolidated Plan of Reorganization (the

"Plan") in November 1985. To fund the Plan and provide working capital, they have arranged for a $5 million loan from a major stock holder, Pisers Leasing Company ("Pisers"), which is payable on demand. Tr. at 42. From the post-petition operation of a 70 store chain the Debtors conservatively project sales of approximately $7.9 million from October 1985 through December 1985 (Debtor's Exhibit 1), and annual sales of approximately $25 million during 1986. Tr. at 40.

Significant losses are projected, however, for 6 of the 7 months during the period from October 1985 through April 1986. Debtors Exhibit 1. Simon testified that a return to profitability is expected by the end of 1986. Tr. at 47. No evidence to the contrary was presented. The discrepancy between the written projected losses and the oral testimony of profits is explained as the time it will take the Debtors to regain its former customers.

To some extent the forecast is supported by the projection. It shows pro forma operation losses of $471,000 and $442,000 per month for January and February 1986, after the Christmas season, which are cut to $224,000 and $183,000 respectively for March and April 1986. These losses are far below the average monthly losses in the months preceding the Christmas season. Debtors Exhibit 1. They may moreover be overstated since they are based on a 42% gross margin. Even during the Debtors' troubled period a 45% gross margin was achieved. Tr. at 35–36. Also indicative of future profitability is that the Debtors have sharply reduced administrative overhead and expenses. Tr. at 36.

There is no evidence to contradict this projection or suggest that rent would not be paid throughout the terms of each of these leases. Rather, the landlords suggest that, while the projection anticipates payment of rent each month, it is possible that Pisers will call in its loan at any time during the projected period, leaving the Debtors without funds to meet its rental obligations. Landlords Post-Trial Memo at 9. Pisers, however, is a major stockholder of the Debtors. It has a vested interest in

leaving the loan in place and giving the Debtors considerable leeway in reorganizing. Furthermore, it appears from the Debtors' projected cash flow statement that the loan is designed largely to furnish the $4.18 million projected to make the payments required by the Plan, all of which are budgeted for November 1985. Debtors Exhibit 1.

Store number 249 is the only lease of the eleven which the Debtors seek to assume in which a default, other than the monetary defaults noted above, is claimed by the landlord. Specifically, Forbes/Cohen Properties ("Forbes/Cohen"), the landlord, claims that the named tenant under the lease is not involved in the Debtors' Chapter 11 proceeding, and therefore cannot seek to assume it, and that there exists a default under the lease for failure to comply with the assignment provision of the lease. Tr. at 78–79, 83; Forbes/Cohen Exhibit A. That provision provides that there shall be no assignment or other transfer of the lease or an interest in the lease without the prior written consent of Forbes/Cohen. In the event of an assignment or merger with a wholly-owned subsidiary of the parent, however, the landlord's consent is unnecessary so long as the new tenant assumes in writing all of the existing tenant's obligations under the lease and that the new tenant have a net worth equal to or greater than the tenant's net worth. Exhibit A.

The original tenant under the lease for store number 249 was National Mens Shop Lansing, Inc. ("Lansing"), a wholly owned subsidiary of National Shirt, the guarantor of the lease. By letter dated March 11, 1972, the Debtors advised Forbes/Cohen that the present tenant would be merged into a new tenant, also called "National Mens Shops Lansing, Inc." and also a wholly owned subsidiary of National Shirt. Also, the landlord was advised that National Shirt, the guarantor of the lease, would be merged into a new corporation by the same name. Debtors Supplemental Exhibit.

It is undisputed that on December 28, 1973, Lansing was merged into National Mens Shop Maple, Inc. ("Maple") which is a debtor and debtor-in-possession in the pending Chapter 11 cases. Such merger did not change the business conducted by the Debtors at store number 249. Tr. at 86. Forbes/Cohen apparently received notice of such merger by letter which erroneously stated that the merger was from Lansing to itself rather than to Maple. Tr. at 84. Nothing in the record indicates any objection to the merger. At all times since the commencement of the store number 249 lease, the rental obligations have been paid by National Shirt. Tr. at 78.

Forbes/Cohen admits receipt of rent owed under the lease (Tr. at 76–78), but disputes the Debtors' ability to give adequate assurance of future performance, and asserts that it is now seeking a profitable tenant who can achieve sales sufficient to pay high percentage rentals. Tr. at 104.

## II

■ The statutory exception to a debtor-in-possession's ability to assume or reject an executory contract or unexpired lease in its business judgment, *see Control Data Corp. v. Zelman,* 602 F.2d 38, 43 (2d Cir. 1979), at issue here is contained in § 365(b) of the Bankruptcy Code. That section provides that "[i]f there has been a default in an executory contract or unexpired lease of the debtor," the contract or lease may not be assumed unless the assuming party cures or provides adequate assurances of the prompt cure of such default, compensates or adequately assures prompt compensation for actual pecuniary loss suffered by another party to the lease resulting from such default, and "provides adequate assurance of future performance under such contract or lease." Here there is no dispute regarding the providence of the Debtors decision to assume the leases. Since there are no defaults for stores numbered 248 and 403, the exception is inapplicable by its terms and the motion is to be granted since the propriety of the Debtors'

exercise of their business judgment is not disputed.

The monetary defaults under the remaining leases are minor. They represent payments for rent or additional rent under the leases which accrued between the last payment of rent and the time of the filing of the petition. The landlords do not dispute Debtors' ability to cure and compensate. They dispute the Debtors' ability to provide the adequate assurance of future performance required of a shopping center lessee.

■ Since the term "adequate assurance of future performance" is not subject to statutory definition, we turn to the legislative history of the Code to glean its intended meaning. That history reveals that the term was intended to be given a practical, pragmatic construction in light of the facts of each case. *In re Sapolin Paints, Inc.,* 5 B.R. 412, 420–21, 6 B.C.D. 776, 2 C.B.C.2d 854 (Bankr.E.D.N.Y.1980). As designed by Congress, it does not mean absolute insurance that the debtor will thrive and make a profit. *In re Alipat, Inc.,* 36 B.R. 274, 278 (Bankr.E.D.Mo.1984). Regarding a lease convenant to pay rent, the test is simply whether it appears that the rent will be paid and other obligations thereunder met. *See In re Evelyn Byrnes, Inc.,* 32 B.R. 825, 829, 9 C.B.C.2d 430 (Bankr.S.D.N.Y.1983); *In the Matter of U.L. Radio Corp.,* 19 B.R. 537, 542, 8 B.C.D. 1273, 6 C.B.C.2d 430 (Bankr.S.D.N.Y.1982). A guaranty is not required. That the leaseholds here are in shopping centers is immaterial on this point. Where a lease is being assumed and not being assigned, § 365(b)(3)(A) requires only that the term be construed to include adequate assurance "of the source of rent and other consideration due under such lease ...".

Moreover, in determining when the rent reserved in a lease will be paid, the statute itself indicates in addition to the source of payment, the extent and history of defaults and the record of making prior payments are of prime consideration. It is only on default that a landlord is entitled to adequate assurance, § 365(b)(1), and the obvious purpose of this section, particularly in

light of the statutory voiding of bankruptcy default clauses contained in § 365(e)(1), is to afford landlords with a measure of protection from having to be saddled with a debtor that may continue to default and return to bankruptcy.

■ The emphasis is on protection. Section 365 gives no indication that a landlord, whether or not of a shopping center, is to improve its position upon the bankruptcy of a tenant. The statute affords no relief to a landlord simply because it might have the opportunity to rent the premises to others at a higher base or percentage rent and would otherwise seek to escape the bargain it made. *In re Webster Clothes Inc.,* 36 B.R. 260, 264, 10 C.B.C.2d 1055 (Bankr.D. Md.1984). Such a notion would be totally contradictory to the Congressional "policy of favoring assumption and assignment as a means of continuing performance and realizing value and thereby assisting the debtor in its rehabilitation or liquidation." *In re Evelyn Byrnes, Inc.,* 32 B.R. at 829.

■ In the application of these concepts to the facts of record here, it is plain that the Debtors have furnished adequate assurance of future performance of these leases. These are Debtors whose history of paying rent, even in troubling times just prior to bankruptcy, is virtually flawless and marred largely by having filed their petitions before rental invoices for the last month were received. Given that the § 365(b) exception is contingent on default and that the defaults here are due to the general notion that debtors-in-possession pay pre-petition debts through a plan or upon assumption pursuant to court order strongly indicates that adequate assurance of future performance has been given. To this is to be added the undisputed fact that the defaults here are minor in relation to the annual base rent. Simply put, there is every indication that the rent reserved in these leases will be paid.

The demand nature of the Pisers loan hardly contradicts such an assessment. To hold otherwise would effectively require most, if not all, debtors-in-possession who lease real estate to obtain financing on a non-demand basis. There is no indication that Congress sought such a result. Indeed, § 364 of the Code, pursuant to which a debtor-in-possession may obtain credit, contains no such requirement. That the financing may continue post confirmation is of no moment. Chapter 11 financing is often the basis for permanent financing.

More to the point is the landlords' concern that the Debtors' written forecasts do not project profits. In a case where rent had not been paid for a considerable time and was of greater magnitude than here, that concern would have more weight in assessing whether there is adequate assurance that rent will be paid. It is thus given less weight here. Furthermore, since the projections are based on a consolidated entity reorganized to exclude historically unprofitable stores and show some support for the Debtors' ultimate claim of return to profitability and since the leases are guaranteed by the parent, that concern is ameliorated in this case. We thus hold that the Debtors have satisfied their burden of furnishing these landlords with adequate assurance of future performance under these leases.

### III

Also without merit is the objection by Forbes/Cohen that there is a default under the assignment provision in the lease for store number 249 which cannot be cured. At issue here is only whether there has been a pre-petition default due to the assignment in 1972 and, if so, whether it can now be asserted. There has been no assignment of the tenant's interest during the Chapter 11 cases. Such an assignment would require the showing of substantial similarity of financial condition and operating performance of a proposed assignee and its guarantor as provided by § 365(b)(3)(A) of the Code.

■ Under the first clause of the assignment provision providing for Forbes/Cohen's consent, the Debtors are entitled to prevail. Forbes/Cohen has submitted no evidence that, having learned of the assign-

ment, its failure to consent is reasonable. It thereby has not discharged its burden of doing so. *E.g., In re Speare,* 360 F.2d 882, 885 (2d Cir.1966). The Debtors also are clearly entitled to prevail under the second clause providing, *inter alia,* that consent is unnecessary in the event of assignment or merger with a subsidiary of National Shirt. As to the alleged notice default, it is undisputed that the Debtors attempted in 1972 to provide notice of the merger in accordance with the lease provisions. The misidentification of the assignee subsidiary was clearly a typographical error. The guaranty by National Shirt remains. Forbes/Cohen, by continuing to accept payment of its rent since 1972, has waived any default by virtue of the assignment. *E.g., Davidson v. Shivitz,* 354 F.2d 946, 948 (2d Cir.1966). As explained in *In re Duplan Corp.,* 473 F.Supp. 1089 (S.D.N.Y.1979), under New York law, acceptance of rent indicates a landlord's intent to treat the lease as continuing even where the lease expressly states to the contrary. *Id.* at 1091–92. Forbes/Cohen makes no claim that Michigan law, if applicable, would hold otherwise in either respect.

The foregoing constitutes findings of fact and conclusions of law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure. The Debtors' motion to assume these eleven leases is to be granted.

SETTLE ORDER.