**In re RACHELS INDUSTRIES, INC., Debtor.**

**Bankruptcy No. 88–27271–B (sbb).**

United States Bankruptcy Court,
W.D. Tennessee, W.D.

Jan. 24, 1990.

 

Stanley J. Huggins, Memphis, Tenn., for debtor.

Bradley A. MacLean, Nashville, Tenn., for Third Nat. Bank.

Christopher L. Carson, Atlanta, Ga., for First Nat. Bank of Atlanta.

W. Rowlett Scott, Stephen P. Hale, Memphis, Tenn., for City of Memphis.

John L. Ryder, Steven N. Douglass, Memphis, Tenn., for Unsecured Creditors' Committee.

Julie Chinn, Asst. U.S. Trustee, Memphis, Tenn.

## MEMORANDUM OPINION AND ORDER ON DEBTOR'S MOTION TO ASSUME LEASE

WILLIAM H. BROWN, Bankruptcy Judge.

In this Chapter 11 case, most of the assets of the debtor have been liquidated by prior sales. However, the debtor asserts that it wishes to reorganize by leasing certain real property known as the former International Harvester facility (hereinafter "Harvester"), and pursuant to that goal, the debtor filed a motion to assume its lease of the Harvester facility. The facility is owned by the City of Memphis, Tennessee (hereinafter the "City"), and the City has objected to the debtor's assumption of the lease on various grounds. After continuances requested by the parties, hearings began on the lease assumption and related issues on September 18, 1989. The parties have now filed post-hearing memoranda and the Court has reviewed the numerous exhibits, memoranda and all related materials. The following memorandum opinion constitutes findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

### ISSUES PRESENTED

On December 27, 1988, the debtor filed its motion seeking to assume its lease with the City of Memphis. The debtor now contends that the agreement between the debtor and the City is not a true lease. Therefore, the first issues presented are whether

the agreement is in fact a lease and whether it is subject to assumption by Rachels Industries. Other critical issues are whether there has been a default or defaults of the debtor's obligations so as to trigger 11 U.S.C. § 365(b), whether proper notice of any alleged defaults was given by the City, and if so, whether the debtor has cured or provided adequate assurance of prompt curing of any defaults. Further, if the lease may be assumed, has the debtor provided adequate assurance of future performance under the lease? The City has presented proof of several defaults, any one or combination of which the City asserts are material defaults, and the Court must analyze each of those asserted defaults to determine whether any one or more present obstacles to the debtor's assumption.

The Third National Bank and First National Bank of Atlanta (hereinafter "lenders") are the primary secured creditors of the debtor, and those lenders originally supported the debtor's motion to assume the lease. Further, the unsecured creditors' committee supports the debtor's motion to assume. However, the lenders, subsequent to the trial and briefing, have withdrawn their support of the debtor's assumption. *See*, "Lenders' Notice of Default and Termination of Debtor's Use of Cash Collateral and Withdrawal of Support for Debtor's Motion to Assume Harvester Lease," filed December 27, 1989.

### HISTORY OF CASE

This Chapter 11 case was filed on October 6, 1988. As yet, a disclosure has not been approved and a final plan has not yet been submitted to creditors for consideration. However, the debtor has undertaken a substantial liquidation of its assets. By prior Court orders, the operating manufacturing divisions of the debtor have been sold, with the proceeds going to the secured lenders. The debtor has also been pursuing avoidance litigation and collection of accounts receivable. The debtor has

asserted in open court that the primary asset remaining is the lease of the Harvester facility, and the debtor intends to propose an amended plan, to be supported by the unsecured creditors' committee, which plan would incorporate the assumption of the Harvester lease and utilization of that Harvester property for the generation of long term income to satisfy, at least in part, claims of creditors. The City of Memphis is a creditor of the debtor; however, a judicial determination has not been made as to whether the City remains secured.[1]

### IS THE AGREEMENT A LEASE?

■ At the hearing on the debtor's motion to assume the lease, the debtor took the position that there was no default under § 365(b), or at least no material default, and that any alleged defaults related to conditions which existed at the Harvester facility prior to the execution of the agreement between the City and Rachels Industries, Inc. As previously noted, the debtor had filed a motion to assume a "lease," but in its post-hearing memoranda the debtor took the position that the proof at the hearing established that the written agreement between the City and Rachels was not in fact a true lease as contemplated by § 365. Rather, the debtor now asserts that the agreement was nothing more than a "structure designed to provide a property tax abatement for the debtor." (Memorandum of the debtor, p. 2). The City, of course, points out that in the debtor's motion filed December 27, 1988, the debtor stated that it was a "lessee" and that it desired to "assume said leases." Further, in a motion for continuance filed July 14, 1989, jointly by the lenders, the debtor and the unsecured creditors' committee, the pleadings stated that the "debtor is lessee under a certain Lease Agreement dated December 13, 1985, between Rachels Industries, Inc. as lessee and the City of Memphis as lessor." As the City asserts, this matter was tried for some five

1. The debtor appears to take the position that the cancellation of the $9,000,000 note vitiates the City's secured position (*See*, Exhibit 157); however, that issue has not been presented to the Court. Moreover, if the City were eliminated as a secured creditor, the Court concludes that the City would remain a lessor.

days of court time as a contested matter under § 365. Thus, even if the Court could accept the debtor's argument that the agreement is not a "lease," the question would still remain as to whether § 365 is applicable if the agreement would nevertheless be an executory contract.

However, the Court does not need to fully address that question, since the Court concludes that the debtor is estopped from changing its position. Having taken the position in pleadings as well as in hearings that the agreement was a lease subject to assumption by the debtor, the debtor may not now be heard to take an alternative position that the agreement is less than a lease. The debtor and creditors' committee argue that this Court must look to the "economic substance" of this transaction, citing *In re PCH Associates*, 804 F.2d 193, 199 (2d Cir.1986), in order to determine whether there is a true lease or a mere financing transaction between the City and Rachels. The Court has engaged in that analysis and while the lease is clearly related to the financial transaction, that fact does not render the lease a nullity. The lease was a part of a transaction to enable Rachels to benefit from use of the Harvester facility but to also enable the City to encourage industrial and economic development for the City. To permit the debtor to choose only some aspects of that transaction while avoiding others would be "offensive to equitable principles." *In re Martin Brothers Toolmakers, Inc.*, 796 F.2d 1435, 1441 (11th Cir.1986). Further, this is not a situation of the City/landlord attempting to escape the consequences of an investor/creditor status. *In re PCH Associates, supra*, at 200. Rather, the City admits it has two roles, one as landlord and one as creditor.

As the Sixth Circuit has observed, executory contracts or leases involve "obligations which continue into the future." *In re Jolly*, 574 F.2d 349, 350–351 (6th Cir.1978), *cert. denied*, 439 U.S. 929, 99 S.Ct. 316, 58 L.Ed.2d 322 (1978); *In re Becknell & Grace Coal, Inc.*, 761 F.2d 319, 322 (6th Cir.1985); *cert. denied, Sloan v. Hicks*, 474 U.S. 1006, 106 S.Ct. 528, 88 L.Ed.2d 460 (1985). Further, that Court

has recently observed that "[t]he Bankruptcy Code does not explicitly define the term 'executory contract.' The legislative history, however, indicates that Congress intended the term to be defined as a 'contract on which performance remains due to some extent on both sides.'" *In re Terrell*, 892 F.2d 469, 471 (6th Cir.1989) (citations to legislative history omitted). This contractual obligation clearly required future obligations and performance of both the City and Rachels. At the very least, the option to purchase contained in the lease is executory, and that is, in part, what Rachels attempts to preserve. The general rule is that an executory contract must be assumed or rejected in its entirety. 2 King, *Collier on Bankruptcy*, (15th Ed.) ¶ 365.03. *See also, e.g., Airlift Intern, Inc.*, 761 F.2d 1503, 1508 (11th Cir.1985); *In re Giesing*, 96 B.R. 229, 231 (Bankr.W. D.Mo.1989).

It is abundantly clear that this lease is not the typical lease. For example, the rental is only $1.00 per year, with an entity related to the lessee having an exclusive option to purchase at any time during the lease term for an additional $1.00 provided that the lessee had met certain conditions, including no defaults, and employment and capital investment requirements set out by the City. The unsecured creditors' committee argued in its post-hearing brief that the agreement was in actuality a sale subject to conditions precedent. Even if that were so, this Court would still be required to analyze the proof to determine whether all conditions precedent had been met in order to permit the debtor to assume the executory sales agreement or to exercise the option. Moreover, having determined that the debtor is precluded from now taking the position that this agreement is not a lease, the Court is mindful that the arguments made by the debtor, unsecured creditors' committee and lenders on the nature of the agreement are relevant to the issue of whether material terms of the lease agreement are in default so as to preclude assumption of the lease.

## SECTION 365

Having concluded that the agreement subject of this dispute is, in fact, a lease,

§ 365 of the Bankruptcy Code is clearly applicable. Section 365(a) provides that "subject to the Court's approval," a trustee or debtor-in-possession may assume or reject an executory contract or unexpired lease. However, § 365 provides conditions for such assumptions. Specifically, § 365(b) provides as follows:

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

(2) Paragraph (1) of this subsection does not apply to a default that is a breach of a provision relating to—

(A) the insolvency or financial condition of the debtor at any time before the closing of the case;

(B) the commencement of a case under this title; or

(C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.

The Court observes that there is no issue presented under § 365(c)(3) of a pre-bankruptcy termination of this lease. *Compare, In re Memphis–Fridays Associates*, 88 B.R. 830 (Bankr.W.D.Tenn.1988). This lease was in effect at the time of the bankruptcy filing.

## BURDEN AND ELEMENTS OF PROOF

In a proceeding under § 365, the party moving to assume a lease has the ultimate burden of persuasion that the lease is one subject to assumption and that all requirements for assumption have been met. *In re Memphis–Fridays Associates, supra*, at 840–841. *See also, e.g., Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309–1210 (5th Cir.1985); *In re Airlift Intern, Inc.*, 761 F.2d 1503, 1508 (11th Cir.1985); *In re Future Growth Enterprises, Inc.*, 61 B.R. 469, 472 (Bankr.E.D.Pa.1986). However, the City, in this instance, has the initial burden of showing defaults and that those defaults have been properly noticed to the lessee. If defaults are established by the proof, then the burden shifts back to the debtor to provide satisfactory proof that the defaults have either been cured or will be promptly cured and that there would be adequate assurance of future performance. *See, e.g., In re OK Kwi Lynn Candles, Inc.*, 75 B.R. 97, 101 (Bankr.N.D.Ohio 1987). However, if the proof does not establish any default in an executory contract or unexpired lease, the elements of § 365(b)(1) are not required to be proven by the debtor. *In re Natco Industries, Inc.*, 54 B.R. 436, 440–441 (Bankr.S.D.N.Y.1985). This conclusion seems clear from a natural reading of the statute. Where a debtor seeks to assume an unexpired lease or executory contract pursuant to which there has been a default, the general rule is that a three part test must be met before assumption can occur. That test is set forth in § 365(b)(1) as follows:

(1) the default must be cured or adequate assurance of prompt cure provided;

(2) any party, other than the debtor, to the contract or lease must be compensated, or given adequate assurance of prompt compensation, for any actual pecuniary loss resulting from the default; and

(3) adequate assurance of future performance under such contract or lease must be provided.

Each requirement must be complied with before assumption can be approved. *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1310 (5th Cir.1985); *In re Windmill Farms, Inc.*, 841 F.2d 1467, 1473 (9th Cir.1988); *In re Corporacion de Servicios Medicos Hosp.*, 805 F.2d 440, 447

(1st Cir.1986); *In re Airlift International, Inc.*, 761 F.2d 1503, 1508 (11th Cir.1985).

Adequate assurance of future performance is clearly an element which must be met in addition to the curing of any default. *Id.* In contrast, where there has been *no* default, the provision of adequate assurance of future performance is not necessary. *See, e.g., In re Natco Industries, Inc.*, 54 B.R. 436, 440–441 (Bankr.S.D.N.Y.1985). Adequate assurance of future performance is not defined in the Code. Thus, several courts have looked to the legislative history for guidance and have concluded that "the term was intended to be given a practical, pragmatic construction in light of the facts of each case." *Id.* "As designed by Congress, it does not mean absolute insurance that the debtor will thrive and make a profit." *Id.*, citing *In re Alipat, Inc.*, 36 B.R. 274, 278 (Bankr. E.D.Mo.1984). Rather, the emphasis is on protection of the lessor, and the intention "is to afford landlords with a measure of protection from having to be saddled with a debtor that may continue to default and return to bankruptcy." *In re Natco Industries, Inc.*, 54 B.R. at 441. According to the Fifth Circuit, the language is adopted from the Uniform Commercial Code and "adequate assurance" is "to be defined by commercial rather than legal standards." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d at 1310. Thus, courts often determine whether adequate assurance of future performance has been offered by considering "whether the debtor's financial data indicated its ability to generate an income stream sufficient to meet its obligations, the general economic outlook in the debtor's industry and the presence of a guarantee." *Id.* (citations omitted)

■ Moreover, there appears to be a consensus that adequate assurance of future performance must be provided with respect to *all* of the covenants of the agreement sought to be assumed given that § 365(b)(1) requires compliance with all elements under its subparts (A), (B), *and* (C), and § 365(b)(1)(C) requires, by its terms, "adequate assurance of future perform-

ance *under such contract or lease.*" (Emphasis added). Therefore, "[r]egarding a lease covenant to pay rent, the test [has been] whether it appears that the rent will be paid and *other obligations thereunder met.*" (Emphasis added). *In re Natco Industries, Inc.*, 54 B.R. at 440, citing *In re Evelyn Byrnes, Inc.*, 32 B.R. 825, 829 (Bankr.S.D.N.Y.1983); *In the Matter of U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y.1982). Where a lease incorporated a franchise agreement, it was held that compliance with the terms of the franchise agreement and adequate assurance of future performance of same must be shown before assumption of the lease could occur. *In re Ok–KWI Lynn Candles, Inc.*, 75 B.R. 97, 101 (Bankr.N.D.Ohio 1987). Similarly, where the trustee could not provide adequate assurance of the future performance of non-economic aspects of an executory contract, assumption has been denied. *In re Southern Biotech, Inc.*, 37 B.R. 311, 317 (Bankr.M.D.Fla.1983); *In re Integrated Petroleum Co., Inc.*, 44 B.R. 210, 214 (Bankr. N.D.Ohio 1984).

■ It is well settled that assumption of an executory contract or unexpired lease entails assumption of the benefits and the burdens associated therewith. *In re Holland Enterprises, Inc.*, 25 B.R. 301, 303 (D.C.N.C.1982); *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d at 1311; *In re Chicago, Rock Island and Pacific R.R. Co.*, 860 F.2d 267 (7th Cir.1988); *In re Ritchey*, 84 B.R. 474, 476 (Bankr.N.D.Ohio 1988); *In re Ashley*, 41 B.R. 67, 71 (Bankr. E.D.Mich.1984). Thus, it has been held that upon assumption, "the estate becomes liable for performance of the entire contract, as if bankruptcy had never intervened." *In re Airlift Intern., Inc.*, 761 F.2d at 1508, citing 2 *Collier on Bankruptcy*, ¶ 365.01(1) (15th Ed.1979); *Vilas & Sommer, Inc. v. Mahony (In re SteelShip Corp.)*, 576 F.2d 128, 132 (8th Cir.1978). *See also, In re Chugiak Boat Works, Inc.*, 18 B.R. 292, 296–97 (Bankr.D.Alaska 1982).

■ Federal law determines the definition of executory contracts and leases, but as to whether a default exists under a lease or contract, this Court must look to state

law. *In re Terrell, supra,* citing, *In re Cochise College Park, Inc.,* 703 F.2d 1339, 1348, n. 4 (9th Cir.1983); *In re Streets and Beard Farm Partnership,* 882 F.2d 233, 235 (7th Cir.1989). On the question of Tennessee law, which governs under Article 21 of this lease (Exhibit 5), this Court has previously observed:

> Assuming that their terms are not otherwise illegal, Tennessee law unequivocally gives effect to agreements, including leases, as written. *See, e.g., St. Paul Surplus Lines v. Bishops Gate Insurance Co.,* 725 S.W.2d 948 (Tenn.App. 1986); *Pizza Pumps of America, Inc. v. Krispy Kreme Doughnuts Corp., et al.,* 11 TAM s1–13 (Tenn.App.1986) [available on WESTLAW, 1986 WL 12174]; Tenn. Code Ann. Section 47–50–112(a).[4] Moreover, under Tennessee law, "in the absence of fraud or mistake, a contract must be interpreted and enforced as written even though it contains terms which may be thought harsh and unjust." *St. Paul Surplus Lines, supra,* [951]; *Ballard v. North American Life and Casualty Ins. Co.,* 667 S.W.2d 79, 82 (Tenn. App.1983). In construing contracts, the Tennessee courts hold that "the intention of the parties as ascertained from the language of the instrument controls." *First American National Bank v. Chicken System of America, Inc.,* 510 S.W.2d 906, 908 (Tenn.1974); *see also, St. Paul Surplus Lines, supra,* 951; *Pizza Pumps of America, Inc., supra,* p. 5. Further, the court cannot make a new contract for the parties but is constrained to interpret the contract as written. *St. Paul Surplus Lines, Id.*

---

4. Tennessee Code Annotated Section 47–50–112(a):

(a) All contracts, including, but not limited to, notes, security agreements, deeds of trust and installment sales contracts, in writing and signed by the party to be bound, including endorsements thereon, shall be prima facie evidence that the contract contains the true intention of the parties, and shall be enforced as written; provided, however, nothing herein shall limit the right of any party to contest the agreement on the basis it was procured by fraud or limit the right of any party to assert any other rights or defense provided by common law or statutory law in regard to contracts.

■ If a lease requires performance of another agreement, referred to or incorporated into the lease, failure to perform under that additional agreement may be a default under the lease as well. *In re Easthampton Sand & Gravel Co., Inc.,* 25 B.R. 193, 198–199 (Bankr.E.D.N.Y.1982). Therefore, this Court must examine the *entire* lease contract, including any incorporated documents.

## FINDINGS OF FACT

1. In 1985, the City held an option to purchase for $5,000 from International Harvester, that company's facility at 3003 Harvester Lane, Memphis, Tennessee. (Tab 35 of Exhibit 3). In that option, the "purchaser [City] accepts the said real estate in its existing condition." (Tab 35 of Exhibit 3, p. 5).

2. There was then in existence an arrangement between the City and International Harvester for the funding, with Urban Development Action Grant ("UDAG") federal funds available to the City, of retooling of the Harvester plant for a new product to be manufactured by Harvester. However, prior to the implementation of these UDAG funds for that purpose, Harvester decided to close its plant and to terminate its arrangement, repaying to the City UDAG funding in the amount of $1,800,000. (Tab 1 of Exhibit 1).

3. The City and Rachels Industries discussed Rachels' development of the property for a plant to manufacture Rachels' products, under an arrangement by which the City would provide a total of $9,000,000 in loans to Rachels, $6,600,000 being UDAG funds (including the $1,800,000 repaid by Harvester) and $2,400,000 being Community Development Block Grant (CDBG) funds. The UDAG and CDBG funds are federal funds made available to cities for economic development and job creation. The purpose of the arrangement between the City and Rachels was to permit the development of the Harvester facilities for Rachels' manufacturing use, and Rachels would obtain other necessary fi-

nancing from its lenders, Third National Bank in Nashville and the First National Bank of Atlanta. A memorandum of understanding was entered into between the City and Rachels on September 10, 1985. (Tab 1 of Exhibit 1).

4. In December, 1985, after negotiations between Rachels and the City, the following transactions took place: The larger portion of the Harvester facility (excluding 20 acres formerly used as a hazardous waste dump) was conveyed by International Harvester to KHR, Inc., a corporation affiliated with Rachels. KHR, in effect, exercised the option held by the City to purchase the property from International Harvester for $5,000. (Tab 36 of Exhibit 3). KHR then granted a first lien deed of trust on the property for the benefit of the secured lenders to secure a debt of $36,-500,000. (Tab 38 of Exhibit 3). Immediately thereafter, the property was conveyed by KHR to the City subject to the lender's mortgage. (Tab 39 of Exhibit 3). Immediately thereafter, the City leased the property to Rachels. (Exhibit 5). Also, the City loaned Rachels the $9,000,000 agreed sum. (Tab 2 of Exhibit 1). At this point, of course, the City held title to the property, subject to the lender's mortgage, but the City did not assume any of the mortgage obligations. (Tab 39 of Exhibit 3). The City's loan of $9,000,000 of course was subordinate to the lender's first mortgage.

5. The City obtained an indemnity agreement from International Harvester on December 13, 1985, the same date as the transfer of title, whereby International Harvester indemnified only the City for any liability arising from a closed hazardous disposal site on the twenty acres excluded from the conveyance to KHR. (Tab 45 of Exhibit 3). The State of Tennessee had previously issued an order directing International Harvester to assess, investigate and conduct remedial measures on that dump site. (Tab 44 of Exhibit 3).

6. Under the terms of the City's loan, no payments were to be made by Rachels for five years, at which point payments would be amortized over the following twenty years. The City's $9,000,000 loan was further secured by real property of Rachels other than the Harvester facility and by the personal property of Rachels, including property located in the Harvester facility. The City's deeds of trust and security agreements were subordinate to the lenders' deeds of trust and security agreements encumbering the same collateral. (Tab 2 of Exhibit 1). The lease entered into between the City and Rachels on the Harvester facility was for a twenty-five year term, being the same period of time as the City's loan to Rachels, at a base rental of $1.00 per year for the first five years. Since title to the property was held by the City, there would be no real property taxes due on the property for five years. After the first five years, the base rent would be payment to the City in the amount of the real property taxes which would otherwise have been due if title to the property had not been held by the City. (Exhibit 5).

7. The lease included an exclusive option to purchase the property from the City by Cypress/BJ, Inc. which was another corporation affiliated with Rachels. The option to purchase could be exercised for $1.00, provided certain conditions were met. Specifically, the option provisions are found in Article 16 of the lease. (Exhibit 5).

8. The provisions in the lease, including the option, resulted from negotiations between the parties. (*See* testimony of Kenneth W. Ellison).

9. Rachels took possession of the property in December, 1985, and in 1986, Rachels began its manufacturing operations at the Harvester facility.

10. In 1987, Rachels went into default on the loans from the secured creditors. An agreement was reached with the City in early 1988, whereby the $6,600,000 UDAG portion of the City's loan to Rachels was converted from a loan to equity in the form of non-voting Class A preferred stock of Rachels. The provisions with respect to repayment of the $2,400,000 CDBG portion of the loan were modified. This conversion of debt to equity improved the debtor's financial statements to assist in satisfying a default with the secured lenders. At the same time as this restructuring with the

City, the City made an additional $800,000 loan to the debtor. (*See* generally, Exhibit 4).

11. Subsequently, the debtor again went into default on the secured creditors' loan and the lenders formally declared a default on September 21, 1988. (Exhibit 25). There is no proof that the City was aware of this default prior to the lease dispute in this bankruptcy.

12. Mr. James M. Crews, Jr., President of the debtor, admitted that there had been earlier defaults under the loan agreement with the secured lenders, prior to the official default notice of September 21, 1988.

13. On October 6, 1988, Rachels filed this Chapter 11 case and subsequently terminated its manufacturing operations at the Harvester facility, except for its Norflex division.

14. Over the next several months, and under the Chapter 11, Rachels liquidated its operating divisions and equipment located at the Harvester facility, applying the sales proceeds to the secured lenders' debt. (*See*, Exhibits 26, 27, 28).

15. The secured creditors' debt is presently secured by, but not limited to, the International Harvester facility and by property on Florida Street in Memphis which is rented for $120,000 annually to the purchaser of one of Rachels' operating divisions. The debtor is no longer a party to the Florida Street lease.

16. Subsequent to the Chapter 11 filing and the cessation of its operating divisions, the debtor has sub-leased a portion of the Harvester facility to various parties. By Court order entered February 28, 1989, the debtor employed Coldwell Banker to attempt to lease all or portions of the Harvester facility. (Exhibit 21).

17. Subsequent to the debtor's motion to assume the Harvester lease, and beginning January 19, 1989, the City has given written notices of purported defaults under the lease. (Exhibit 6). Rachels received no notices of default prior to the bankruptcy filing.[2] (*See* testimony of James Crews).

18. The Harvester facility was built shortly after World War II and much of it is in excess of forty years old. The building contains many of the original building materials, such as roofing, siding, and insulation.

19. The Harvester facility consists of approximately 135 acres with approximately 1,200,000 square feet of improvements, exclusive of the hazardous waste dump, foundry, and power house buildings. An aerial photograph of the facility is contained in Exhibits 24 and 88, and a plat of the facility is found in Exhibit 17.

20. The debtor and the City were obviously aware of the relative age of the Harvester facilities and of the general conditions of the Harvester facility in December, 1985.

21. The lease agreement recites that Rachels had made "a full and complete examination" of the leased premises and that Rachels accepted the premises "AS IS" without any warranty from the City. (Exhibit 5, Article 4.1).

22. It is unclear whether the City had inspected the property prior to its purchase from KHR, but obviously the opportunity for inspection existed.

23. As a part of the 1985 documentation, in a letter dated September 27, 1985, Rachels represented that it would obtain all necessary governmental permits and approvals, including, without limitation, any environmental reviews and approvals. (Exhibit 9).

24. Whatever the condition of the property at the time of the subject lease, it is clear that the condition of the property has worsened, in varying degrees. The flooring, roofing, and insulation have not been fully maintained.

25. In photographs taken by Rod Phillips for the City, evidence of roof leaks and resulting damage to insulation, flooring, ceiling panels, walls and inventory is clearly demonstrated. (Exhibits 36–85). It is obvious that the roof leaks. The only question in this regard is how extensive and expensive are the necessary repairs.

2. By an order lifting the stay, the Court had permitted the City to give notice of default.

26. Mr. Donald Wayne Manley, a roof consultant, testified that he made visual inspections in 1986 and 1989, and he made photographs of the roof areas. (Exhibits 88–134; 88A–134A). Buildings 3, 4 and 5 have transite (asbestos material) roof structures. (*See* Exhibit 136 for sample). Mr. Manley's inspections found problems with roof drains (*see,* e.g., Exhibit 90); with patching (*see,* e.g., Exhibit 91); with deteriorated roofing membrane (*see,* e.g., Exhibit 92); with breaks in expansion joints (*see,* e.g., Exhibit 95); and with general deterioration. (Exhibits 88–134). He found the roof "somewhat worse" in May 1989 than it was in October 1986. If the transite roof were removed, replacement cost would be $2.8 million, excluding the cost of proper asbestos disposal. Assuming the transite remained in place, Mr. Manley placed the costs of his recommended repairs at $1,650,450 at today's cost. (Exhibit 137). He said that the roof was in only slightly worse condition from 1985 to 1986. As Mr. Manley testified, it is obvious that the primary reason for the roof's condition is its age.

27. Rachels had obtained a roof study from Mr. Manley in October, 1986. (Exhibit 10). This study noted numerous problems and recommended substantial repairs. Rachels subsequently issued a purchase order for approximately $200,000 in roof repairs to Building 3–A. (Exhibit 11). In its 1987 and 1988 budgets, Rachels had placed a line item of in excess of $1,000,000 for roof repairs. (Exhibits 12–15). However, only approximately $30,000 in roof repairs actually were performed by Rachels, involving a small portion of the roof area. It is obvious that a lack of funds is the explanation for the lack of extensive roof repairs.

28. Rachels introduced proof through Horace Heath of another roof inspection in September, 1989 (Exhibit 154–155), after which Mr. Heath concluded that the roof could be successfully repaired at significantly less cost. While there appears to be an error in Mr. Heath's calculation of square footage, nevertheless Mr. Heath presented an alternative credible view of a method available for roof repair.

29. Mr. John Bandy, who was with International Harvester for twelve years and then worked for the debtor, testified that there was no major difference in the roof leaks since Rachels' occupancy. Mr. Bandy testified that Rachels had engaged in some maintenance and repair of the roof, asbestos, sprinklers, electrical system, security system, heating and air conditioning. However, Rachels lacked the funds to do all needed repairs.

30. The original roof is of course in stages of deterioration, and Rachels' lack of necessary funds has contributed to the deterioration because of lack of optimal maintenance. The debtor's former facilities manager for six months, James Kenneth Drescher, testified that leaks from the roof caused the wood flooring to buckle. (*See,* e.g., Exhibits 57, 78). Underneath the wood flooring is a concrete sub-floor.

31. Mr. Franklin Jarman, general manager for the debtor, testified that in their projected plan, $60,000 per year was budgeted for roof repairs, which amount he believed to be sufficient.

32. A more expensive problem exists in reference the extensive presence of asbestos materials at the Harvester facility. At the request of the City, Environmental Consulting and Laboratory Services visited the site in January, 1989 and in August, 1989, and found evidence of asbestos in piping insulation which was severely damaged. Further, deterioration of the asbestos exterior wall and roofing material was found. (*See,* Exhibit 148, with photographs, and Exhibit 149). It is clear that the wall and roofing asbestos has deteriorated due to its age and normal wear. This company estimated cost of removal and disposal of the thermal system insulation to be in excess of one million dollars with a similar sum needed to seal the roof.

33. After a brief asbestos survey, William A. Lancaster, a civil engineer with experience in asbestos, concluded that the asbestos pipe insulation could be repaired rather than removed, that the transite wall panels could be routinely maintained, and that the asbestos roof materials were in

generally good (not friable) condition. However, Mr. Lancaster did not perform a full scale survey, which he admitted would be necessary in order to fully evaluate the asbestos situation at Harvester.

34. There is no proof concerning the condition of asbestos in the building in December 1985. However, it is obvious that the facility contained substantial asbestos in roofing material, siding material, pipe and other insulation. The thermal and piping insulation is friable, meaning that it will crumble under hand pressure. Friable asbestos may become airborne and may be hazardous to health if not properly contained. Some of the cloth wrapping holding the piping and thermal insulation in place has deteriorated and some has been damaged from water leaks. Some of this insulation has fallen to the floor on occasion. Some loose thermal insulation is stored on the property.

35. There have been no air samples taken to establish the extent of asbestos fiber concentration over a measured period of time.

36. The asbestos problems have been addressed by Rachels in only a limited manner, such as minor clean up, rewrapping of pipes and limited isolation of problem areas. The City presented proof that up to $2,000,000 needed to be spent to make the Harvester facility environmentally safe from asbestos risk.

37. As an alternative to removal, it is common for owners to maintain the asbestos in place. However, maintenance effort and expense is still required.

38. There were and continue to be on the property fourteen underground storage tanks, which were located on the property in 1985. The tanks have never been used by Rachels. On May 6, 1986, Rachels mailed notification to the Tennessee Department of Health of the location and condition of underground storage tanks. (Exhibit 138). On this notice, Rachels listed itself as the owner of the tanks and stated that the tanks were permanently out of service. Rachels now takes the position that that report was in error, that Rachels never had responsibility for the tanks and that the tanks are the sole responsibility of the City as owner of the realty.

39. Tests of the underground storage tanks reveal that at least four exceed the maximum total petroleum hydrocarbon (TPH) or benzene, toluene, ethyl benzene and xylenes (BTEX) allowed by the State of Tennessee. (See testimony of Michael Taylor and Exhibit 141). Mr. Taylor recommended removal of the storage tanks and an environmental assessment plan at an estimated cost of $240,000. (Exhibit 145).

40. An excellent cross examination of Mr. Taylor revealed many questions about the source and extent of any contamination. It is obvious that the tanks have been in place for many years and were last used by International Harvester. They are now permanently out of use, (Exhibit 138) which condition may require their being pulled or filled with a suitable inert material. (See testimony of Daphne Hall).

41. It is obvious that the tanks are an expensive problem. Ms. Hall, a supervisor with the Tennessee Department of Health and Environment, did not know of a case in which one who neither owned or operated such tanks was held liable for underground tank contamination. If contamination occurred prior to 1985, the appropriate regulations could require that the former owner be liable. (See testimony of Daphne Hall).

42. The debtor's position was that the underground tanks, which were never used by Rachels, were owned by the City and thus were the City's responsibility, notwithstanding the Notification of Underground Storage Tanks filed by Rachels with the State of Tennessee on May 6, 1986. (Exhibit 33; compare Exhibit 35). For purposes of this opinion, this Court does not need to determine who is ultimately liable for tank contamination expenses.

43. The City further presented proof that Rachels was in violation of certain fire codes and building code requirements. For example, complaints about the sprinkler system, fire wall penetration, and lack of fire rated tenant separations with regard to sub-lease facilities were proven. However, any problems with the sprinkler system

appeared to be minor, as did fire wall penetration problems. The problem of establishing fire rated tenant separation walls would be much more expensive.

44. Mr. Drescher said that some sprinkler pipes were broken and that the 1989 annual review was not performed. However, he admitted that the accidental break was immediately repaired. The debtor employed Quarles Fire Protection to maintain, service and inspect its fire sprinkler system, and Quarles converted the wet system to a dry one in order to prevent freezing. The Rachels system was working properly at its last inspection in May, 1988. (Exhibit 153).

45. Apparent violations of the Southern Building Code, adopted as the Shelby County Building Code (Exhibits 146–147) were pointed out by Ronnie Gilbreath, a Memphis/Shelby County Building Inspector. Mr. Gilbreath testified that there was no certificate of occupancy issued for any of the debtor's current sub-tenants, and Mr. Gilbreath found inadequate tenant separation walls and exit corridors at the building site.

46. Some violations of the City's Fire Code were found in June, 1989, in visits by Harold Thomas McKinney, Jr., of the Memphis Fire Department. (*See* Exhibit 6, Fourth Default Notice with its attached Exhibit A). However, it is obvious that the routine fire inspection process, including Board of Appeals review, has not been followed by the City in this case.

47. The lease between the City and Rachels was, in part, a means to abate real property taxes for the first five years. The debtor, which has been receiving the real property tax abatement through the lease arrangements, has accrued unpaid personal property taxes, which it proposes to pay over six years. The debtor's schedules show approximately $200,000 in prepetition personal property taxes to be unpaid and due.

48. The basic cost to maintain and operate the building, according to Mr. Crews, is $200,000 per year, a cost which will increase with more sub-tenants in place.

49. The debtor has no contracts for sub-tenants, other than with existing tenants.

50. In a lease environment, typically the landlord maintains the roof and walls and pays for tenant separation, unless the contract provides otherwise. (*See* testimony of Alan D. Berns). Rachels, as sub-lessor, would have these responsibilities, as well as asbestos maintenance/removal costs, unless those responsibilities were contracted to a sub-tenant.

51. In the first year of its projected operation, if the Court permits the lease assumption, Mr. Crews estimated a negative cash flow for the reorganized debtor of $450,000, which amount contains some capital improvement cost.

52. In a spread sheet projection, Mr. Jarman estimated a first year operating loss of almost $300,000 and a new cash injection of $200,000. However, by the seventh year, he projected operating income of $1,341,231. (Exhibit 22). From the operating income, repayment of secured debt and a portion of the unsecured debt is proposed. (Exhibit 18). Mr. Jarman testified that a loan contribution of $250,000 by the lenders was essential to make these projections work.

53. Capital infusion will be needed, for which the debtor hoped to obtain $200,000 from private investment. In a September 18, 1989, Memorandum of Understanding between the lenders and the debtor, the lenders agreed to advance up to $250,000 under certain conditions and subject to repayment terms, which conditions included Court approval of the lease assumption and plan of reorganization. (Exhibit 18). The lenders have subsequently withdrawn their support of the debtor's assumption effort.

54. The current balance of the two secured lenders' loans, at the time of the hearing, was $4,921,588.55, plus accruing interest and attorney's fees. The lenders expect a balance of $3.5 million after all assets, except for the Harvester facility, are liquidated.

55. The lenders had consented to a conditional waiver of default, provided the plan was confirmed and that the reorganized debtor performs as projected. (*See*

testimony of David Eason). The performance criteria had not yet been articulated, but the lenders expected to be paid. Subsequent to the hearing, the lenders declared a new default in their agreement with the debtor.

56. Nevertheless, the banks have agreed with the debtor that they would not foreclose prior to April, 1990.

57. The Harvester facility, despite its problems, has possibilities for resale or for tenant use. Its sale value, dependent upon the type of sale, varies from $6.8 million to $9.1 million and its lease value ranges from $.62 to $1.50 per square foot. (*See* testimony of Alan D. Berns and Exhibit 20).

58. Rachels did not default in the payment of the minimal $1.00 annual rent.

59. Rachels did expend substantial funds for leasehold improvements, apparently primarily to adapt the facility to its manufacturing purposes. (*See*, Exhibit 7). However, documentation supporting the $2,410,790 in building and leasehold improvements was not placed into evidence, and no finding can be made as to the amount spent on various areas of leasehold property. (*See* however, Exhibit 164).

60. At Rachels' request, the City acknowledged on May 27, 1988, that Rachels had complied with the lease/option requirements that Rachels had maintained an average annual level of 500 employees through February, 1988, and that Rachels had invested in excess of $10,000,000 in capital. (Exhibit 8).

61. In substance, the City asserted that Rachels had permitted the facility to deteriorate since 1985. In contrast, Rachels asserted that any and all adverse conditions were in existence at the time of the 1985 agreement and that the City was improperly attempting to place expensive burdens on Rachels.

62. The City did not complain of roof conditions, the underground storage tanks, building or fire code violations, nor of the existence of asbestos from September, 1987, to August, 1988, according to Rachels' former president and CEO.

63. Mr. Gregory Duckett, Director of Housing and Community Development for the City, first became involved with Rachels at the time of its bankruptcy filing, and he made the decision to declare a default after his discussion with counsel. Mr. Duckett stated that if the lease is not assumed, the City intends to lock up the facility indefinitely. Further, the City had no plans for the property, no potential buyer and no potential lessees. Neither does the City intend to insure the property, provide security, nor make any repairs.

64. Relative to the alleged defaults, the City conducted its first inspection of the Harvester facility in August, 1989.

65. The lease provides a cure period of thirty days for defaults. (Exhibit 5, Article 10).

66. The debtor's position was that the City's notices of default were vague. (*See*, testimony of Crews and Jarman).

67. The first notice of default was dated January 19, 1989, referring in part to failure to repair and maintain portions of the building, failure to pay personal property taxes, and default with the secured lenders. The notice refers to specific articles of the lease, and this notice of default is clear.

### FINDINGS AND CONCLUSIONS ON ASSUMPTION

Although the Court has concluded that the lease between the City and Rachels is a § 365 lease, the Court has also analyzed the proof as if no § 365 assumption issues were involved, and the Court concludes that at this point in time, the debtor has failed to satisfy the conditions precedent to an exercise of the option to purchase. Likewise, the debtor has failed to satisfy the requirements of § 365 for assumption of the lease. This means of course that the Court does find that there are existing defaults of the debtor's contractual obligations which have not been cured. Also, adequate assurance of prompt cure and of future performance have not been provided by the debtor.

First, the Court notes that only one default is necessary in order to trigger

§ 365(b)(1). It would be sufficient for the Court then to point out at least one clear default. For example, the debtor's failure to pay accrued and delinquent personal property taxes is a default under Article 2.5 and Article 3.3 of the lease, of which the debtor was given notice in the January 19, 1989, default letter from the City. Article 10 of the lease made this an event of default if not cured within thirty days of receipt of notice. The Court does not agree with the argument that this is a mere "technical" default. It is rather a clear and material default, which must be cured. *In re Natco Industries, Inc.*, 54 B.R. 436, 440 (Bankr.S.D.N.Y.1985).

▮ However, the failure to pay these taxes is not the only default. When viewed in its entirety, the proof establishes that the debtor is in default for its failure to make all necessary repairs and to perform all necessary maintenance, as a natural reading of the lease would require, for which default notice was also given. (*See* Exhibit 5, Articles 4.3, 46; Exhibit 6). The debtor and creditors' committee would ask the Court to give a strained and one-sided reading to the lease and related agreements. The Court must read words in their natural, ordinary and customary meaning or usage, if such a reading is possible. *Evco Corp. v. Ross*, 528 S.W.2d 20, 23 (Tenn.1975). Here, a natural reading leads the Court to the comfortable conclusion that the lease expressed the competent parties' intention that Rachels adopted all maintenance obligations and relieved the City of such duties. Such a natural, unstrained construction of the lease obligations leaves the parties in the position for which they bargained. *See, St. Paul Surplus Lines Ins. Co. v. Bishops Gate Ins. Co.*, 725 S.W.2d 948, 951 (Tenn.App. 1986). The Court cannot rewrite the lease to eliminate duties assumed by a competent party. *See, e.g., Capitol Funds, Inc. v. Arlen Realty, Inc.*, 755 F.2d 1544, 1549 (11th Cir.1985).

In this regard, it is certainly true that both parties were or should have been aware of the age and general condition of the Harvester property in 1985 when the contract was made. Rachels argues the fact that the general physical condition of the property predates the 1985 agreement with the City; therefore, this should diminish Rachels' obligations. The Court does not need to rule, for example, on whether Rachels obligated itself to replace the aging roof. It is enough that Rachels agreed to maintain the roof, and Rachels, due to lack of sufficient funds, has failed in that obligation.

The proof may be in conflict on how much expenditure is needed to repair the roof, but the Court is convinced that the proof establishes that the majority of the roof is in a progressive state of deterioration. The roof leaks have led to damage in the building's interior, including the asbestos insulation and the flooring. The simple conclusion is that old roofs need substantial maintenance, and the debtor has not properly maintained this roof. In turn, this lack of maintenance has led to lack of proper maintenance of some asbestos pipe insulation and of a significant amount of flooring.

The debtor further argues that "[t]here is no proof indicating there had been any material deterioration in the asbestos since the execution of the lease with the debtor in 1985." (Debtor's Memorandum, p. 14). Similar arguments are made concerning other portions of the physical plant. The debtor's argument was well presented but it is misplaced. The Court's concern is not the degree of deterioration since 1985 but rather the steps taken by the debtor to maintain the property so as to prevent unnecessary deterioration. The building by its very age is in deterioration. The question is what is the debtor doing to counteract the natural effects of age. The proof convinced the Court that the debtor has not done enough.

▮ Notice of default for failure to maintain was given in the January 19, 1989 letter from the City. (Exhibit 6). Further, notice was given in an August 14, 1989, letter. (Exhibit 6). It is true that all notices of default came after the bankruptcy filing, in fact after the debtor had filed its motion to assume. But, the debtor, when

attempting to assume under § 365, must cure both prepetition and postpetition defaults. *In re Berkshire Chemical Haulers, Inc.*, 20 B.R. 454, 457 (Bankr.D.Mass. 1982). This conclusion is clear after a reading of § 365(b)(1), which measures defaults as of the "time of assumption," which cannot come before the Court approves assumption. *See, In re Harris Management Co., Inc.*, 791 F.2d 1412, 1414 (9th Cir. 1986).

■ Having found a default in the failure to pay personal property taxes and in failure to properly maintain the roof, the Court does not need to explore other defaults; however, the Court notes that cogent proof was put forward to establish defaults in reference the lack of adequate maintenance of asbestos,[3] the breach of loan agreement obligations with the secured lenders and violations of City Building Code restrictions concerning tenant separation. However, there are questions of whether the defaults in the loan agreements are sufficient as an independent basis for lease default in view of the notice requirements of Article 10.1(c) of the lease. (Exhibit 5). The Court is therefore not relying upon this as an event of default. The failure to provide adequate tenant separation between the debtor's sub-lessees is illustrative of the difficulty this debtor has had in complying with the expansive and expensive lease requirements.[4] But, difficulty in complying with the lease is not an excuse for the debtor's defaults. As previously stated, the parties bargained for their respective positions, and § 365 is a protective statute, intended to enforce contractual obligations. *See, In re Natco Industries, Inc.*, 54 B.R. at 441.

The Court is specifically declining to make findings or reach conclusions concerning alleged fire code or underground storage tank violations. It is not clear that any significant fire code violations existed nor is it clear who is obligated to remedy any underground storage tank problems.

■ It is sufficient that other defaults have been found, thereby requiring the debtor to prove its ability to promptly cure. 11 U.S.C. § 365(b)(1)(A). As this Court has previously observed, the debtor has the burden of proving cure. *In re Memphis–Fridays Associates*, 88 B.R. 830, 840 (Bankr.W.D.Tenn.1988). After examination of the evidence, the Court now concludes that this debtor has failed to prove a cure or adequate assurance of prompt cure. The debtor's proof on cure was grounded upon the facts that it had a Memorandum of Understanding with the secured lenders (Exhibit 18), that it would obtain a cash injection from the secured lenders as well as from investors, and that it would generate income from sub-leasing of the Harvester facility. As a result of this "reorganization" the debtor projected future income and expenses, including maintenance. (Exhibit 22). The debtor's *pro forma* assumed that the secured lenders were financially supporting the debtor, but, the bank's post-hearing pleading has eliminated that support.[5] The proof fails to establish the debtor's financial ability to promptly cure any of the defaults, a conclusion which the Court would have reached even with the Memorandum of Understanding between the lenders and debtor still in place. The debtor's financial projections showed an anticipated loss for the first year, and no satisfactory assurance of sufficient rental income has been produced.

■ If the Court could find proof of prompt cure, there would still be lacking proof of adequate assurance of future performance. As previously noted under the elements of proof for § 365, once a default is found the debtor must prove adequate assurance of future performance of the entire lease. This debtor conceded that the automatic stay did not prevent the City from enforcing its police or regulatory powers. 11 U.S.C. § 362(b)(4). If the debtor were able to assume this lease, it would

---

3. The Court is not finding that the debtor has an obligation to remove asbestos.

4. See Articles 4.5, 4.6 of lease (Exhibit 5).

5. The Court, *sua sponte*, called a status conference on January 9, 1990, which established that there was no longer an agreement between the lenders and debtor.

perhaps be a brief victory, if the City then proceeded to enforce building or other code requirements. Adequate assurance of future performance requires compliance with both monetary and non-economic terms of the lease. This debtor has failed to convince this Court that it can comply with future obligations to properly maintain the property or to comply with the City's code requirements. For example, proper tenant wall separation is required in order to satisfy fire and building code requirements. The debtor's financial projections did not satisfy the Court that the debtor would meet its landlord obligations in sub-leasing the property. Moreover, the withdrawal of the secured lender's support for the debtor's plans underscores the lack of adequate assurance of future performance.

As to required future maintenance, if the Court accepted only the debtor's proof, for example on the roof repairs needed, the withdrawal of the secured lenders' support eliminates essential financial assurances.

As another indication that Rachels' proof was lacking on the issue of adequate assurance of future performance, the lease requires the rent to escalate on December 14, 1990, to an amount equivalent to real property taxes. The debtor projected $100,000 for this increased rent, with the City asserting a higher amount. Without the financial support from the lenders, the debtor's proof failed to adequately assure that it could pay the increased rental in the future.

The Court has viewed the lease in its entirety. The entire 1985 transaction was intended to permit Rachels to use the property and to perhaps own it, but the Court may not give Rachels that part of the bargain by ignoring Rachels' obligations. The debtor and creditors' committee argue, for example, that the option to purchase (Article 16 of the Lease, Exhibit 5) has conditions precedent which have been met. However, these parties point to satisfaction of only two of the conditions. Article 16.-1(c)(3) of the lease provides that exercise of the option is conditioned upon the debtor not being "in default under this lease as provided in Article 10." Because the Court

has found convincing evidence of defaults, the option may not be exercised whether it is viewed as a part of a lease or as a conditional contract.

Moreover, the Court cannot conclude that the City's motives are suspect. The City has a legitimate interest as owner of the property, lessor and regulator in seeing that the lease obligations are properly enforced. This Court is merely enforcing the contractual terms against both parties. The reality simply is that Rachels contractually and knowingly assumed full responsibility for the leased property. Rachels, like the City, had ample opportunity to apprise itself of the condition of and need for repairs on the property. Rachels argues that the City was aware of environmental and other conditions of the property prior to the execution of its agreement with the City. This may be so, but so was Rachels aware. The Court has not attempted to alter the parties' contractual positions, and neither may the Court improve Rachels' position.

Finally, the Court notes that this lease contained contractual provisions for cure in the event of bankruptcy. (Article 11, Exhibit 5). The Court has not relied upon those provisions in reaching its conclusion; however, those contractual terms also require the curing of any default and adequate assurance of future performance. Reliance upon those contractual terms would not aid the debtor, especially in view of the contract's definitions that adequate assurance mandates a minimum of unsecured assets sufficient to pay *all* secured debt, administrative expense, *and* lease requirements. (Article 11.1(c), Exhibit 5).

## CONCLUSION

For the foregoing reasons, the Court FINDS and CONCLUDES that the agreement between the debtor and City is a lease subject to § 365 requirements, that there are defaults in the contractual obligations of the debtor, that cure of those defaults has not been satisfactorily proven, and that inadequate assurance of future performance has been given.

IT IS THEREFORE ORDERED that the debtor's motion to assume its lease with the City is denied, and the lease may not be assumed.

SO ORDERED.